Cecil S. **WOOD**, Appellant,

v.

**WESTERN BEEF FACTORY, INC.,**
a Colorado corporation, Appellee.

No. 8773.

United States Court of Appeals
Tenth Circuit.

May 19, 1967.

C. J. Murphy of Lohf, Murphy & Barnhill, Denver, Colo., for appellant.

Hugh A. Burns, Denver, Colo. (Dawson, Nagel, Sherman & Howard and Charles R. Frederickson, Denver, Colo., on the brief), for appellee.

Before LEWIS, HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

The appeal is from that part of a judgment dismissing six counterclaims filed by appellant-defendant, Wood.

Appellee, Western Beef Factory, a Colorado corporation, operates a commercial feed lot in Denver. Appellant, Wood, a resident of Wyoming, is engaged in buying, feeding and selling cattle. He began doing business with Western in early 1962 by delivering 31 head of steers to Western's lot for feeding. This transaction was evidenced by a written agreement between the parties, whereby, Western advanced Wood $5,000.00 on the cattle, provided for feeding and caring for them and for the further advance of funds in the future. The account was carried on Western's books as the Wood-W account and was so referred to by the parties. This transaction was completed upon marketing of the cattle.

In September, 1962, Wood became involved in another cattle buying and feeding venture with George Green who owned a packing plant in Denver, known as the S. Adams Packing Company. Under that venture Green was to purchase three year old heifers, known to the trade as heiferettes, and deliver them to Western. That company was to feed and care for them until ready for marketing under arrangements made by Wood, which included the financing of the purchasing by Green. This agreement between Wood and Western was evidenced by a written agreement, defendant's exhibit A, which provides that the cattle to which it ap-

plies will be sold "through a recognized market agency, including any cattle weighed to either Green or S. Adams Packing Company." From September, 1962, until May, 1963, Green purchased 459 heiferettes and delivered them to Western for feeding under the arrangements made by Wood. Western kept this account as the Wood-Green account and it was so referred to by the parties. Green saw the cattle from time to time and determined when each was ready for sale. It had been agreed between Wood and Green that they would share equally in profits and losses of the venture.

During the time this Wood-Green cattle feeding arrangement was in force, Green had taken 28 head of "distressed" cattle out of Western's lots and thereafter failed to account to either Western or Wood for 13 of them. The evidence shows that these 28 heifers were in poor physical condition and would not sell on the regular market but could be butchered and sold as dressed meat. The 13 heifers are involved in the first three dismissed counterclaims.

The evidence shows that Green, as a part of his duties under his agreement with Wood, inspected the cattle at Western's feedlot and would occasionally notice these distressed animals and would order Western to immediately release them to himself on a realization basis [1] and Green would then slaughter and butcher them at his own packing plant and sell the dressed beef to various buyers. Green failed to account for the sale proceeds on 13 of the 28 animals so released to him. The District Court, as to those 13 head, found that Wood and Green were "partners in the operation of the cattle feeding joint venture," that Wood is bound by the acts of his "partner" and that, while defendant's exhibit A was applicable to the cattle involved, the provisions of the agreement relating to sale through a recognized market agency were eliminated when Green instructed Western to release the cattle to himself.

Wood now contends that because he alone financed the cattle, an essential requisite of partnership, co-ownership, is missing, that Green was thus not his partner, and that he cannot be bound by Green's acts in receiving the distressed heifers. In asserting this position, Wood relies on section 6 of the Uniform Partnership Act, enacted by both Wyoming and Colorado, which defines a partnership as " * * * an association of two or more persons to carry on, as co-owners, a business for profit." We do not think it necessary for us to decide whether or not there is a partnership under the Act. The District Court's decision was based on his finding that there was a joint venture. A joint venture requires only that the parties combine their property, money, efforts, skill or knowledge in some common undertaking. The contribution made by each party need not be of the same character. A co-ownership of property is not essential, so long as each joint venturer contributes something promotive of the enterprise.[2] Here Wood contributed financing to the joint venture and Green contributed his special knowledge of feeder cattle and his time and ability in purchasing cattle, inspecting them in Western's lot and deciding when they were to be sold. There was an oral agreement between Wood and Green whereby the operation was to be carried out and they were to share equally in profits and losses. We think there is abundant support for the trial court's conclusion that Wood and Green were carrying on a joint venture. The fact that it referred to them as "partners" in the joint venture does not alter the correctness of that conclusion.

It is elementary that one joint venturer can bind the other joint ventur-

---

1. A "realization" sale is one in which the purchase price of the animal is determined after it has been slaughtered and butchered and the quantity and quality of dressed meat is determined.

2. 30 Am.Jur., Joint Adventures, §§ 9, 13. Swann v. Ashton, 10 Cir., 330 F.2d 995; and see Albina Engine and Machine Works, Inc. v. Abel, 305 F.2d 77.

ers in matters that are within the scope of the joint enterprise.[3] In this regard, Wood has placed reliance on section 9 of the Uniform Partnership Act which, as applicable, provides, essentially, that acts of a partner done in contravention of a restriction on his authority shall not bind the partnership to persons having knowledge of the restriction. Wood contends that the provision requiring sale through a recognized market agency was a restriction upon Green's authority and that Western Beef had knowledge of that restriction. We do recognize that, as a general proposition, the substantive law of partnerships is applicable in determining the rights and liabilities of joint venturers and third parties.[4] And we do think that a joint venturer who acts in contravention of a restriction on his authority cannot bind the other joint venturers to persons who have knowledge of the restriction.[5]

The question remains whether the provision requiring sale through a recognized market agency was in fact a restriction on Green's authority. At the trial, Mr. O'Dea, Western's president, testified that the provision was inserted in the agreement at his suggestion. Its purpose was, according to his testimony, twofold. First, to insure that the cattle sold under the agreement brought the "market" price so that the normal forces of the market would determine the cattle's value.[6] Secondly, to hopefully enable two companies affiliated with Western, a market agency and a stockyards, to get sales commissions and yardage charges when the cattle were sold.

Accepting Western's president's interpretation of this provision, its purpose was not to guarantee that the cattle would be paid for when sold but rather to provide that a third, disinterested party determine the value of the animals and to enable Western's affiliated companies to collect commissions and yardage charges. Wood testified, in substance, that the provision was designed to insure prompt, guaranteed payment when the cattle were sold. The trial judge specifically found that "Plaintiff's [Western's] release of the 28 head of distressed cattle to Mr. Green was not contrary to defendant's [Wood's] instructions." The District Court evidently believed Western's president and it is the trial judge who determines the credibility of witnesses.[7] There is evidence in the record to support the trial judge's finding that Green's acts in receiving, slaughtering and selling the 13 distressed heifers here in issue were not in contravention of any of Wood's "instructions" to Western. This leads us to the conclusion that Green did not act in contravention of any restriction on his authority of which Western had knowledge. Thus, Wood is bound by Green's acts in receiving and disposing of the 13 head of distressed heifers.

3. Bushman Construction Co. v. Air Force Academy Housing Inc., 10 Cir., 327 F.2d 481.

4. Taylor v. Brindley, 10 Cir., 164 F.2d 235; Parks v. Riverside Insurance Co. of America, 10 Cir., 308 F.2d 175; Bushman Construction Co. v. Air Force Academy Housing, 10 Cir., 327 F.2d 481.

5. See 30 Am.Jur., Joint Adventures, § 55.

6. Mr. O'Dea testified:
"Q. Will you explain why, all the reasons?
"A. In view of the fact that Mr. Wood was unlikely to be at Denver during the marketing period because of his many other interests, it placed, I felt, an un-usual burden on Mr. Green, as a partner, to establish the value of the livestock, particularly since he was in the packing business, and I felt that it would be most equitable to both parties to allow the normal forces of the market to determine the value of the livestock.
"Q. And this would occur if the cattle were sold through a recognized market agency, is that right?
"A. That is correct. We have a third party there, standing independently, to establish these values.

7. Southwestern Investment Co. v. Cactus Motor Co., 10 Cir., 355 F.2d 674; DeVilliers v. Atlas Corp., 10 Cir., 360 F.2d 292.

Sometime in January, 1963, Wood bought 49 yearling heifers in Wyoming and arranged with Western to feed them on the same terms but separate and apart from the heiferette feeding arrangements. This operation was carried in a separate account on Western's books and designated the Wood-W account. These heifers were fed until May 23, 1963, when Western turned 48 [8] of them over to Green or his packing company for slaughter and sale to a Denver supermarket. This buyer paid Green for the 48 heifers and neither Wood nor Western ever received any money for them. Wood contends that Western breached the agreement by releasing the cattle directly to Green rather than selling them through a "recognized market agency," as was provided for in the written agreement between them, and that Western is liable to Wood for the value of the cattle so released. The last three counterclaims concern these 48 cattle.

■ The testimony reveals that, after these 48 cattle were received by Western, the cattle market declined. Green testified that Wood talked with him about these cattle and Green advised that he thought he could sell them after slaughter and realize more money than they would bring on the live market. Wood testified that he called Western's president and told him that if he could "make arrangements where he knows he can collect the money" to go ahead and sell the cattle on a realization basis. He further testified that the requirement that the cattle be sold through a "recognized market agency" was still applicable to the sale. Western's president, however, testified that when Wood called, he asked him to waive the provisions of the agreement and to release the cattle directly to George Green's packing company because Green had found a buyer for the cattle. The trial judge again apparently believed Western's president and we cannot say that he was "clearly erroneous" in finding that Wood thereby waived the provisions of the written agreement.[9]

■ The District Court also found that while Wood believed that defendant's exhibit A governed the sale of these 48 head, Western believed that another agreement applied. Wood now contends that since each party was thinking a different agreement governed the cattle, there could be no modification of defendant's exhibit A because there was no mutual assent. We are not impressed with this argument. The trial judge found that Wood instructed Western "to release the cattle to Mr. Green for slaughter and sale upon a realization basis * * *." Western carried out Wood's instructions and regardless of which agreement applied to the cattle, Wood cannot now complain.

■ Wood's final contention is that with respect to all 61 head, Western was Wood's factor, that Western sold the cattle negligently and contrary to instructions, and that it thereby became liable to respond in damages for any loss suffered by Wood. The point is disposed of easily. According to Wood's own cited authority,[10] in order for there to be a principal-factor relationship, the factor must receive a commission from the proceeds of the sale. There was no such arrangement here. Western's only compensation was its feed lot charges and the interest it received on money loaned to purchase the cattle. The District Court expressly found that Western was not Wood's factor and we think that finding is amply supported by the evidence.

Affirmed.

---

8. One of the 49 heifers died and is not in issue.

9. Rule 52(a), F.R.Civ.P.; Don J. Cummings, Inc. v. Aluminum Manufacturing Corp., 10 Cir., 371 F.2d 118; South-western Investment Co. v. Cactus Motor Co., 10 Cir., 355 F.2d 674; Wells v. Ruiz, 10 Cir., 372 F.2d 119.

10. 35 C.J.S. Factors § 1; 22 Am.Jur., Factors, § 2.