**SYSTEM INVESTMENT CORPORA-
TION, Appellant,**

v.

**MONTVIEW ACCEPTANCE CORPORA-
TION, Nathan Kobey, Robert S. Mitch-
ell, Peoples Bank of Aurora, Etienne
Perenyi, H. J. Bleakley, Richard Green-
er, Henry Allard, Charles E. Holcomb,
Jr., and Purvis Company, Appellees.**

No. 7901.

United States Court of Appeals
Tenth Circuit.

Jan. 13, 1966.

Wesley H. Doan, Denver, Colo. (John R. Trigg, Denver, Colo., with him on brief) for appellant.

Fred M. Winner and William F. Dwyer, Denver, Colo. (Warren O. Martin, Denver, Colo., with them on brief), for appellees.

Before MURRAH, Chief Judge, and PICKETT and HILL, Circuit Judges.

MURRAH, Chief Judge.

The appellee, Montview Acceptance Corporation, brought this diversity suit against appellant, System Investment Company, to enforce three separate "put and call" agreements [1] by the terms of which the investment company agreed with the appellee's assignors to purchase specified amounts of common stock of System Meat Company at a specified price upon demand within a specified time. Each of the agreements in suit was signed for the investment company by Nathan Kobey of the firm of Kobey & Mitchell, attorneys at law who were also officers and directors of the company. Kobey was the Secretary-Treasurer. The company defended on the grounds that (1) Kobey was without actual or apparent authority to execute the instruments; (2) there was no valid consideration, and (3) proper demand as provided in the agreement was not made upon the investment company.

By way of a third party complaint, appellant alleged that if held liable on the contracts, it was entitled to judgment over against its attorneys at law, the assignors and other named third party defendants on the grounds that the agreements were themselves creatures of a conspiracy among the third party defendants to defraud the investment company to the extent of the obligations of the agreements. Kobey and Mitchell were also alleged to be liable for any judgment against the investment company for breach of their fiducial duty by executing the agreements or causing them to be executed.

Upon trial without a jury the court found and concluded that Kobey, who signed the agreements as an officer of the company, was authorized to do so; that the agreements were supported by valid consideration and that due demand had been made thereon. On the third party complaint the court found and concluded that none of the third party defendants entered into a conspiracy to defraud the investment company by execution or use of the put and call agreements or by any other means. The court also found that at all critical times the law firm of Kobey and Mitchell stood in

---

1. "A put is a negotiable option contract giving the bearer the right to deliver to the writer of the contract a certain number of shares of a particular stock at a fixed price on or before a certain date. A call is a similar option giving the bearer the right to buy securities." Yale Law Journal, Vol. 69:869.

a fiduciary relationship to the investment company, but that Kobey was authorized by the investment company and its sole stockholder, B. M. Stewart, to execute the agreements and that by such execution neither Kobey nor Mitchell breached any fiducial duty which they or either of them owed to their clients. Judgment was entered accordingly.

Admittedly, the correctness of the trial court's judgment turns upon the sufficiency of the record evidence to support its critical findings on agency as well as consideration and demand, i. e. see J. T. Majors & Son, Inc. v. Lippert Bros., Inc., 10 Cir., 263 F.2d 650. This means, of course, we will not disturb the judgment unless we can say from review of the entire record that its findings and conclusions are without factual support in the record and are, therefore, clearly erroneous. See Southwestern Investment Company v. Cactus Motor Company, 10 Cir. 1965, 355 F.2d 674; McSorley's, Inc. v. United States, 10 Cir., 323 F.2d 900; United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007.

The pertinent facts either undisputed or found by the court from creditable evidence are as follows. System Investment Company, a California corporation owned and operated a large ranch and feed lot in Wyoming. Someone conceived the idea of building a packing plant near the feed lots and the System Meat Company was organized for that purpose. Stewart acquired substantial shares of stock in it, and when in the course of construction it encountered financial difficulties, Stewart both individually and through the investment company loaned money to the promoters and to the corporation in furtherance of the construction work. It soon became apparent that a public offering of the stock would be necessary to complete the plant. At Stewart's suggestion, the meat company retained Kobey and Mitchell to arrange for the public offering and its underwriting through the third party defendant Purvis & Company which was wholly owned and controlled by Kobey and Mitchell.

The offering was expressly conditioned on the sale of all of the stock and if all were not sold, the amount received from actual sales would be refunded to the stock purchasers. When the underwriters were unable to market the stock, Stewart and the investment company both made advances to the meat company and later guaranteed the payment of a bank loan from which the amounts owing Stewart and the investment company were repaid. Kobey advised Stewart that the underwriting could not be completed without the financial assistance of Stewart and the investment company. Stewart thereupon authorized Kobey to do whatever was necessary to complete the underwritings and to use his and the investment company's credit and bonds belonging to him with an actual value of $75,000 in such manner as Kobey deemed necessary. The bonds were delivered to Kobey on condition that they would be returned when they had served their purposes.

Apparently as a part of the plan to dispose of the stock, Kobey entered into a put and call agreement on behalf of the investment company with one Armstrong to induce Armstrong to buy 10,000 shares of the meat company stock for $50,000. This transaction was financed by Armstrong's borrowing the purchase price of the stock from the North Denver Bank. Acting on behalf of the investment company, Kobey guaranteed the Armstrong note. In connection with the transaction Kobey furnished the bank a copy of a resolution adopted by the investment company which recited in material part " * * * That any one of the officers above named shall be and he hereby is authorized on behalf of the corporation to guarantee or otherwise make this corporation liable for any debt, default, or obligation of others when, in the opinion of said officer, said guarantee shall be for the benefit of this corporation." Kobey and Perenyi, third party defendant and president of the bank, testified that Stewart approved this transaction by telephone.

Soon thereafter Kobey, acting on behalf of the investment company, entered into another put and call agreement with one Newman by the terms of which Newman agreed to purchase 12,000 shares of meat company stock for $60,000. Stewart personally guaranteed the payment of Newman's note to a bank for the purchase money. In response to questions from the court Kobey testified that he and Stewart discussed the transaction in his office; that Stewart read the Newman put and call agreement and that they did discuss Stewart's guarantee of the Newman loan by the investment company " * * * further collateralized with these bonds of B. M. Stewart." Kobey further testified that Stewart was told about " * * * those other agreements we've got so far * * * " but did not discuss the terms.

This brings us to the put and call agreements in suit and to the findings of the court to the effect that Kobey went to third party defendant Bleakley, who was president of the third party defendant Peoples Bank of Aurora. He explained the need to complete the underwriting and proposed a put and call agreement whereby the Peoples Bank would purchase the stock of the meat company collateralized by Stewart's housing authority bonds. Bleakley did not regard the proposal as one the bank should undertake, but presented the matter to the third party defendants Allard, Greener and Holcomb indicating that the bank would loan them the money with which to purchase the stock. They were assured there was no risk and that the stock would be repurchased at a profit within ninety days. Allard, Greener and Holcomb thereupon gave their notes to the Peoples Bank for the purchase price of the stock and entered into the agreement in suit with Kobey acting on behalf of the investment company. Apparently the Stewart bonds were used to collateralize the bank loan to Allard, Greener and Holcomb. No specific evidence for Kobey's authority to enter into the agreements or to collateralize the bonds was exhibited to the bank or to Allard, Green-

er and Holcomb, but the court specifically found that the defendant Bleakley owned an interest in the North Denver Bank, was closely associated with Perenyi in both banks, and "as a result, Bleakley had knowledge of the Armstrong transaction."

When the stock was not called for repurchase within the specified time, Allard, Greener and Holcomb turned to the bank for the necessary action to require the investment company to repurchase the stock for the stipulated price. In that connection the trial court specifically found that they did not specifically request the bank or anyone to make a demand upon the investment company in their behalf for the repurchase of the stock, but that they did repeatedly request Bleakley, president of the bank, to see to it that the agreements were honored according to their terms; that Bleakley eventually instructed the bank's attorneys to make formal demand upon the investment company in behalf of Allard, Greener and Holcomb. Demand was made, and the court concluded it was impliedly authorized and that demand by the bank constituted a valid demand on the investment company in behalf of the parties to the agreements.

The agreements were finally assigned to the appellee, Montview Acceptance Corporation, a wholly owned subsidiary of the bank. The Allard, Greener and Holcomb notes were assigned to Montview and cancelled. Montview thereupon brought this suit as assignee of the agreements.

█ The rules governing the creation and interpretation of Kobey's authority in this case are universally accepted. The American Law Institute Restatement of the Law, Agency, 2d, states that " * * * authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." § 26. See also American National Bank of Sapulpa, Okl. v. Bartlett, 10 Cir., 40 F.2d 21; Anheuser-Busch,

Inc. v. Grovier-Starr Produce Co., 10 Cir., 128 F.2d 146. " * * * apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." § 27 and Comment a. "Unless so provided by statute, a written authorization is not necessary for the execution of a writing." § 30(1). " * * * the rules for the interpretation of contracts apply to the interpretation of authority." § 32. "An authorization is interpreted in light of all accompanying circumstances, including among other matters: (a) the situation of the parties, their relations to one another, and the business in which they are engaged; (b) * * * the business methods of the principal; (c) facts of which the agent has notice respecting the objects which the principal desires to accomplish; (d) the nature of the subject matter, the circumstances under which the act is to be performed * * * ". § 34. Finally, "Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." § 35 and see also §§ 49 and 76. In the application of these canons of construction the question of authority is ordinarily one of fact. See J. T. Majors & Son, Inc. v. Lippert Bros., Inc., supra.

In our case we start with the absence of any specific authority in Kobey to execute these agreements on behalf of the investment company. So, Kobey's authority, if indeed sustainable, must be found in the words and deeds of the corporation or Stewart who controlled it.

The generalized language of the resolution used in the Armstrong transaction is invoked by the appellees. Appellant says, however, that in the first place it was not intended to include or to convey authority to execute the agreements in suit. It is important to note in that connection that this particular resolution was one of a series adopted by the directors at a special meeting in the midst and under the strain of the difficulties encountered in the underwriting of the meat company stock—a time when the credit of the investment company and Stewart had been committed to the completion of the underwriting. The resolutions reflect primary concern with the financial affairs of the company and specifically relate to authority of the officers to borrow on the credit of the company from an insurance company and banks. The named officers of the corporation were specifically authorized to execute the necessary notes and mortgages to effectuate the borrowings. Then followed the general resolution used in connection with the Armstrong transaction and relied upon here in part to authorize the named officers to bind the corporation for any debt, default or obligation of others when in the opinion of the officer the guarantee is for the benefit of the corporation. The corporate minutes are silent with respect to the underwriting problems of the meat company.

It is suggested that the resolution had reference to guarantees and not put and call agreements, and the resolution does use the word "guarantee" without reference to obligations of the nature involved here. But, the resolution is indicative of the corporate disposition to commit broad authority to the corporate officers in the management of the fiscal affairs of the company. The trial court's action with respect to Kobey's authority does not rest upon this resolution. At most, it was only a circumstance which the court may have taken into consideration in arriving at its ultimate conclusions. We do not think Kobey's authority is made to depend upon the tenor of this resolution.

As we view the case on Kobey's authority, it comes down to this. Stewart, through his investment company, was interested in the establishment of a packing plant near his feed lots and became financially involved as both a stockholder and a creditor in its financial diffi-

culties. He turned to Kobey, his lawyer who was also the Secretary of his investment company, to arrange a public offering of the meat company's stock through Kobey's underwriting company. When it became manifest that the stock could not be sold to the public and that the credit and assets of Stewart and the investment company were necessary to complete the offering, he instructed Kobey to take whatever steps deemed necessary to effectuate the underwriting. He delivered $75,000 worth of bonds to his lawyer to be used as collateral for the stock purchase transactions. He had actual knowledge of the Armstrong and Newman transactions, and it seems fair to say that he had reason to believe that Kobey was entering into other similar transactions for and on behalf of the investment company in order to induce the purchase of stock through bank loans which either Stewart or the investment company guaranteed.

When considered in the light of the situation of the parties, their relationship to each other, the nature of the undertaking in which they were engaged and the methods and manner in which it was to be accomplished, we cannot say that the execution of these agreements was not incidental or reasonably necessary to the accomplishment of those objectives. As the trial court observed, Stewart and Kobey both were of the opinion that if the underwriting could be completed and the meat company's plant put in operation, it would be financially successful, and no loss would result to Stewart or the investment company by reason of the use of their credit and assets. The fact that their hopes and aspirations were not realized does not militate against the authority to enter into the challenged transactions. Certainly, we cannot say that the trial court's findings and conclusions are unjustified by the facts and circumstances of the case.

Stewart's and his investment company's beneficial interest in the success of the enterprise to be effectuated by the underwriting was sufficient consideration for the agreements. Moreover, the agreements themselves contained a promise for a promise, and Stewart and the investment company stood to gain by their performance.

We have no difficulty agreeing with the conclusions of the trial court on the question of due demand.

As to the third party complaint, it is difficult for us to discern how an actionable conspiracy can be made out if, as we hold, Kobey was authorized to enter into the agreements, and they were performed according to their terms and conditions. But, even so, we quite agree with the trial court that the third party defendants did not enter into or carry out a conspiracy to defraud the appellant investment company. This means, of course, that neither Kobey nor Mitchell could have breached his fiduciary duties to their clients.

The judgment is affirmed.