CHICAGO TITLE INSURANCE
COMPANY, a Missouri
Corporation, Plaintiff,

v.

PROGRESSIVE HOUSING, INC., a
California Corporation, and William
Nemour, Defendants.

Willard W. HAYNE, William B. Goreham
and Andrew W. Willis, Defendants and
Third-Party Plaintiffs,

v.

MANZANARES CONSTRUCTION COM-
PANY, Third-Party Defendant.

Civ. A. No. 75–K–533.

United States District Court,
D. Colorado.

June 19, 1978.

As Amended Sept. 22, 1978.

Peter J. Crouse and James E. Brown, Grant, McHendrie, Haines & Crouse, Denver, Colo., for Chicago Title Ins. Co.

Jack S. Silver, Jaros, Silver & Gelt, Denver, Colo., and Dave Perry, San Diego, Cal., for Progressive Housing, Inc. and William Nemour.

James W. Buchanan and William D. Meyer, Hutchinson, Black, Hill, Buchanan & Cook, Boulder, Colo., for Willard W. Hayne, William B. Goreham and Andrew W. Willis.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

KANE, District Judge.

Plaintiff Chicago Title Insurance Company brings this action for damages it incurred as a result of a default by Progressive Housing, Inc., the general contractor, in a construction project of ninety-one (91) low-income housing units in Denver, Colorado. Trial has been bifurcated and we are concerned here only with the claims against three (3) of the defendants. Plaintiff bases its claim against these defendants [Hayne, Goreham and Willis] on an alleged guaranty of Progressive's performance. The circumstances under which the guaranty was prepared and presented form the basis of the instant controversy.

■ The issues are limited to three. Many others related to liability and damages are reserved. I must determine: whether the agent of these defendants, Pawlek, had authority either express or implied, actual or apparent, to bind defendants to a guaranty of performance for the benefit of plaintiff; whether there was any consideration for the alleged guaranty; and whether the alleged negligence of plaintiff in failing to preserve collateral security and failing to use due care in reviewing and relying upon submitted bids and project cost estimates operates as a release of these defendants from their liability under the alleged guaranty. Since I resolve the first issue in favor of these defendants and hold that they did not in fact guarantee anyone's performance for the benefit of plaintiff, it is not necessary to decide the remaining two issues. An ancillary question involving ratification of the actions of Pawlek by defendants will be discussed, but will not be determinative.

The series of transactions involving this construction project which preceded the alleged guaranty of performance now at issue began in the spring of 1973. At that time Progressive contracted with the Housing Authority of the City and County of Denver to construct the low-income housing units. In July, 1973, Progressive obtained a written commitment from Realty and Mortgage Investors of the Pacific (RAMPAC) to provide interim construction financing for the project in the amount of $2,304,000. This commitment was contingent upon two material conditions: that Progressive obtain the personal guaranties of defendants Hayne, Goreham and Willis and William Nemour, President of Progressive; and that RAMPAC and CTI reach an agreement whereby CTI would act as disbursement agent of the loan funds.

In order to meet the first of these conditions to the RAMPAC loan commitment, Progressive and these three individual defendants and William Nemour entered into an agreement for the sales of their personal guaranties of the loan to the construction lender. Under the terms of this agreement, defendants Hayne, Goreham and Willis and William Nemour agreed to provide their guarantees of the construction loan in exchange for a $75,000 fee to be paid by Progressive. On July 26, 1973 this loan guaranty was executed by these defendants and William Nemour to Colorado National Mortgage Company which had become a participant lender with RAMPAC in the construction loan. The terms of the guaranty were carefully detailed in an instrument over two printed pages in length

and the document was personally signed by defendants and their spouses in their resident state of California.

The other condition to the RAMPAC financing commitment was fulfilled at the loan closing on August 7, 1973 when Progressive agreed to participate in CTI's construction disbursing program. By this program CTI undertook to disburse the construction funds and to issue title insurance policies on the various sites, insuring title free and clear of mechanic's and materialmen's liens. Reciprocally, Progressive agreed to complete the construction of the project according to plans and specifications by July 29, 1974. CTI agreed that in the event of Progressive's default, at its option CTI would either purchase the note from the lender or complete the project.

As a condition to providing title insurance and in consideration therefor, plaintiff entered into agreements referred to as "Construction Disbursing Program Agreements" (hereinafter "CDP") as follows:

   a. CDP #LA-154-1 between plaintiff and Progressive.
   b. CDP #LA-154-2 between plaintiff and lender.

The allegation that the guarantee by William Nemour of Progressive Housing, Inc.'s, performance of its obligations contained in CDP #LA-154-1 is void for want of any consideration whatsoever, is without merit.

During the August 7, 1973 closing a single typed sentence was added to CTI's construction disbursement agreements. A few days prior to the closing a CTI employee in Chicago recommended that an additional guaranty by Hayne, Goreham and Willis of Progressive's performance to CTI was needed. The evidence shows that defendants Hayne, Goreham and Willis were never informed of this additional performance guaranty requirement by CTI. In fact, a blank copy of the agreements to be signed at the closing without the guaranty language had been sent to the defendants for their review. Even though CTI had drafted all the construction disbursement agreements for

this type of project on standard forms that did not include a guaranty of performance provision, the recommendation to amend the standard agreements for this transaction was not acted upon by CTI personnel in Denver until the morning of the closing. At the eleventh hour the additional guaranty of Progressive's performance was hastily typed on the bottom of the preprinted agreement between CTI and Progressive by an employee of CTI.

At the trial, CTI employees testified that they did not notify defendants Hayne, Goreham and Willis prior to the closing that such an additional guaranty of performance would be required. Nor did plaintiffs produce any evidence to prove defendants had knowledge of such a requirement. Instead, CTI claims to have obtained a valid and binding guaranty of performance from defendants by virtue of the fact that defendants' agent, Pawlek, signed this homespun addition on their behalf. The manner of procuring the guaranty of performance sharply contrasts with the careful notice, planning and execution of defendants' loan guaranty required by RAMPAC. This substantial departure from the established practices of CTI is material to the examination of whether Pawlek had the authority to bind defendants on the basis of the general power of attorney which was executed for the purpose of permitting him to represent defendants at the loan closing.

CTI argues that Pawlek had authority to bind defendants under the general power of attorney given to him for the purpose of representing them at the loan closing. In *System Investment Corp. v. Montview Acceptance Corp.*, 355 F.2d 463 (10th Cir. 1966), the court adopted the standards set forth in the *Restatement of Agency 2nd* for interpreting the scope of authority created by an agency.

"[T]he rules for the interpretation of contracts apply to the interpretation of authority." § 32. "An authorization is interpreted in light of all accompanying circumstances, including among other matters: (a) the situation of the parties, their relations to one another, and the

business in which they are engaged; (b) * * * the business methods of the principal; (c) facts of which the agent has notice respecting the objects which the principal desires to accomplish; (d) the nature of the subject matter, the circumstances under which the act is to be performed * * * ". § 34. Finally, "Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." § 35 and see also §§ 49 and 76. In the application of these canons of construction the question of authority is ordinarily one of fact. 355 F.2d at 467.

Thus, the evidence presented at trial regarding the circumstances surrounding the purpose of Pawlek's agency, the understanding of the defendants as to the nature of their participation at the closing, and the manner in which the guaranty in question was first proposed by CTI are all relevant to the factual determination of whether Pawlek had the authority to sign the putative performance guaranty on behalf of defendants Hayne, Goreham and Willis.

Defendants became involved in this project when they learned that Progressive needed financial backing in order to obtain a construction loan. In return for a $75,000 fee from Progressive and a share of potential profits from the sale of the housing units upon their completion, defendants agreed to guaranty the construction loan. The evidence shows that this was the only guaranty agreement defendants considered or agreed to enter. Defendants' uncontradicted testimony was that the only reason given for their attendance at the closing was to collect their guarantors fees from Progressive. Thus, when they were unable to attend the closing defendants executed a general power of attorney to Pawlek for the purpose of signing documents required by virtue of their participation as guarantors of the loan. Moreover, the powers of attorney were executed before CTI decided it should have an additional guaranty of performance. The evidence clearly shows that defendants were without knowledge that a performance guaranty or any other

obligation in favor of CTI would be required at the time they authorized Pawlek to be their agent. Further, defendants did not intend for such a guaranty to be executed on their behalf.

Plaintiff contends that the language of the powers of attorney is broad enough to authorize Pawlek's execution of the performance guaranty and relies on subsection (f) of these instruments which includes this litany of authorized transactions:

> To transact business of any kind or class and any act and deed to sign, execute, acknowledge and deliver any deed, lease, assignment of lease, covenant, indenture, indemnity, agreement, mortgage, deed of trust, assignment of mortgage or of the beneficial interest under deed of trust, extension or renewal of any obligation, subordination or waiver of priority, hypothecation, bottomry, charter-party, bill of lading, bill of sale, bill, bond, note, whether negotiable or non-negotiable, receipt, evidence of debt, full or partial release or satisfaction of mortgage, judgment and other debt, requests for partial or full reconveyance of deed of trust and such other instruments in writing of any kind or class as may be necessary or proper in the premises.

Significantly, the word "guaranty" is absent from the list.

■ CTI claims that the authority to sign an agreement is broad enough to include guaranties. Courts have recognized that a guaranty agreement imposes serious obligations upon a guarantor and have generally required evidence of specific authorization before finding that an agent has the authority to bind his principal in a guaranty agreement. As Professor Williston stated in his treatise, "However general the character of the agency may be, a contract of guaranty is normally not to be inferred from such agency." *Williston on Contracts*, 3rd edition, section 277A p. 230. This rule has been applied by several courts:

> "Authority to bind the principal by a contract of guaranty or suretyship is not ordinarily to be implied from the existence of a general agency. 'Such a contract is extraordinary and unusual and

not normally within the powers accruing to an agent by implication, however general the character of the agency; ordinarily the power exists only if expressly given.' " (Citations omitted.) *Hearst Pub. Co. v. Litsky*, 339 Mich. 642, 64 N.W.2d 687, 689 (1954).

See also *Gittings, Neiman-Marcus, Inc. v. Estes*, 440 S.W.2d 90 (Tex.Civ.App. 1969).

When courts have applied rules of construction to powers of attorney, they have held that such a grant of authority must be strictly construed when determining the scope of authority it vests in an agent, *Von Wedel v. McGrath*, 180 F.2d 716 (3rd Cir. 1950), *cert. denied* 340 U.S. 816, 71 S.Ct. 45, 95 L.Ed. 600. This view is consistent with the *Restatement of Agency 2d* position in section 34, comment which gives the rational for strict construction when a power of attorney is a carefully drawn, pre-printed document such as the ones executed by defendants in this case:

> The formal instruments which delineate the extent of authority, such as powers of attorney and contracts for the employment of important agents, either executed on printed forms or otherwise giving evidence of having been carefully drawn by skilled persons, can be assumed to spell out the intent of the principal accurately with a high degree of particularity. Such instruments are interpreted in light of general customs and the relations of the parties, but since such instruments are ordinarily very carefully drawn and scrutinized, the terms used are given a technical rather than a popular meaning, and it is assumed that the document represents the entire understanding of the parties. p. 122

Since Pawlek's powers of attorney lacked a specific grant of authority to bind his principals to a guaranty agreement, he lacked actual authority to effectuate the guaranty.

■ The question next arises whether Pawlek had implied authority to enter into this agreement. CTI presented the testimony of its closing officer at trial who stated that he read the general powers of attorney at the closing and assumed that each vested Pawlek with authority to sign

the guaranty. Case law is well-settled that when a third party knows that an agent's authority is contained in a power of attorney, that party has the duty to read the instrument carefully for limitations of such authority.

If a person has means of knowledge reasonably open to him as to the limits of the agent's authority, he cannot hold the principal unless he uses ordinary diligence to ascertain them, even in those situations in which a principal is otherwise held although the agent goes beyond his authority. He has means of knowledge if he knows or has reason to know that the authority is evidenced by a document open to and intended for his inspection. *DeBoer Construction, Inc. v. Reliance Insurance Co.*, 540 F.2d 486, 490 (10th Cir. 1976)

The closing officer for CTI was an experienced employee who was well acquainted with closing procedures. He testified that he examined the powers of attorney at the closing. This examination should have revealed that nowhere in the powers was the express authority to enter into guaranty agreements stated. Normal care in the closing of a transaction involving in excess of two million dollars should have been taken by CTI when it belatedly decided to require an additional guaranty of performance from these defendants. CTI knew well in advance of the closing that these defendants would not personally be attending. No conduct on the part of defendants contributed in any way to plaintiff's insouciance. CTI representatives, as persons of ordinary prudence in business matters, should have perused the instruments granting Pawlek a general power of attorney and should have insisted upon more than was furnished by him as evidence of his authority to enter into the specific transaction. In order for there to be a finding of implied authority some facts must exist upon which the implication can adhere. The mere presence of an agent armed with general powers of attorney at a multi-party financial closing is not sufficient in law or in fact to bind absent principals to a guaranty added to a prepared document after submission of the document to the principals for their

inspection when the powers of attorney do not specifically delegate the power to make guaranties.

Next we consider the evidence regarding the alleged ratification of Pawlek's acts by defendants. We start from the premise that principals may indeed ratify the acts of their agents and thus become bound after the fact. Clearly Pawlek was the agent of defendants at the closing by virtue of the executed powers of attorney and, even more clearly, his attempted execution of the disputed guaranty was an act beyond the scope of his authority. Even so, defendants herein could have become bound by Pawlek's attempted guaranty had they ratified his act of signature at the closing. The evidence in this respect is not identical with regard to each defendant, but I find the evidence insufficient to support ratification by any. Further, I suggest the possibility that since these defendants were acting in concert in the nature of a joint venture such an extremely serious consequence as ratification of the previously unauthorized act of an agent in signing a guaranty might, as a matter of law, require the ratification of all three before any one defendant could be bound. My suspicion is based on the supposition that under the facts and circumstances of this case the purported guaranty is beyond the scope and purpose of the joint venture itself thus requiring individual consent in order to establish a new joint venture to which established concepts of agency could apply. I need not reach that question, however, since as stated, the evidence fails to show ratification by any of the defendants.

It is to be remembered that Progressive's financing was conditioned upon two separate and distinct yet equally material conditions:

1. RAMPAC required the personal guaranty of William Nemour, President of Progressive and, because that personal guaranty was apparently not cushy enough, additional guaranties of persons or entities with sufficient assets to protect RAMPAC from any loss it might sustain because of Progressive's failure to perform. Thus, for a fee of $75,000 and a share of anticipated profits from the sale of housing units when completed, Hayne, Goreham and Willis agreed to guaranty the construction loan made by RAMPAC to Progressive. The terms of the guaranty were fully negotiated and, among other things, called for the joint and several liability of each of the guarantors.

2. In addition to the guaranties of the construction loan agreement between it and Progressive, RAMPAC required Progressive to agree to use CTI as a disbursing agent of the loan funds. While the use of the disbursing agent was an essential condition in order for Progressive to obtain the financing from RAMPAC, it was only of tangential benefit to Hayne, Goreham and Willis and would have no direct effect upon their obligations to RAMPAC.

Thus, CTI's last minute requirement that Hayne, Goreham and Willis would have to guaranty CTI's performance of the disbursement agreement as well could not reasonably have been anticipated by them. At the same time, however, it was decidedly in the interests of Progressive and Nemour to complete the closing and proceed with the project without delay.

The evidence is not entirely clear whether Pawlek was indeed acting as an agent should in the best interests of his principals. While the matter cannot be stated with precision, there was a gradual shifting of relationships during the course of the entire episode. Pawlek first appears as an employee of Hayne and Goreham in their insurance business. At Hayne's direction Pawlek began to work on Progressive's guaranty proposal which had reached Hayne and Goreham through Willis. Pawlek had numerous contacts with Progressive and Nemour and at some point severed his relationship with Hayne, Goreham and Willis and moved into Progressive's offices. Further, Pawlek became an officer of Progressive and executed various documents for it in connection with the Denver project.

Ratification, according to § 82 of the Restatement of Agency 2nd

"is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all per-

sons, is given effect as if originally authorized by him."

\* \* \* \* \* \*

§ 83.

"affirmance is either

(a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or

(b) conduct by him justifiable only if there were such an election."

\* \* \* \* \* \*

§ 93.

"(1) Except as stated in Subsection (2), affirmance can be established by any conduct of the purported principal manifesting that he consents to be a party to the transaction, or by conduct justifiable only if there is ratification.

(2) Where formalities are requisite for the authorization of an act, its affirmance must be by the same formalities in order to constitute ratification.

(3) The affirmance can be made by an agent authorized so to do."

Further, the Restatement provides that an affirmance must apply to the entirety of the contract or transaction in order to effect ratification.

For the reasons stated above and a review of all of the evidence I find that the burden of establishing ratification has not been met. Based upon significant adverse interests, the shift from employee to officer of Progressive and a careful review of his testimony, I do not accept Pawlek's testimony as credible. I am persuaded that his acts were not made on account of Hayne, Goreham and Willis but rather on account of Progressive and William Nemour.

Precisely how ratification could take place under these circumstances is at best problematical. Even assuming that Pawlek's act of signing the guaranty to CTI was done for the benefit of Hayne, Goreham and Willis or on their account, the formalities for affirmance required by Section 93(2) are nonexistent.

Finally, CTI asserts that Hayne, Goreham and Willis ratified the purported guaranty by signing Plaintiff's Exhibit 19. A number of comments concerning that exhibit need to be made. First, the exhibit is dated over a year after Pawlek signed the purported guaranty and well after CTI knew that the construction project was in dire straits. CTI's own employees admit that the intent of Exhibit 19 was to shore up the shaky platform on which the liability claim against Hayne, Goreham and Willis would be made. Exhibit 19 contains a mere recitation that Hayne, Goreham and Willis had guaranteed Progressive's obligations to CTI. It is the very tissue of *ipse dixit.*

The evidence fails entirely to show that Hayne, Goreham and Willis were aware of the material facts relating to the closing, to the duties and by the various parties to one another, to the options available to CTI, or to conditions then existing which could have afforded them the opportunity to take meaningful steps to avoid loss. Absent knowledge of material facts ratification is not possible. *Watson v. Woodley,* 71 Colo. 391, 207 P. 335 (1922). Given the conditions under which CTI employees withheld such facts from Hayne, Goreham and Willis and attempted to slide the purported ratification by them, the application of an equitable concept affording CTI relief is not permissible. Therefore,

IT IS ORDERED that the complaint of Chicago Title Insurance Company against defendants Willard W. Hayne, William B. Goreham and Andrew Willis, defendants is dismissed with prejudice. Said defendants shall have judgment for their costs expended herein upon the filing of a bill of costs with the Clerk of the Court within ten (10) days from the date hereof.