Helen R. STONE, Trustee for Robert D. Munroe, a Bankrupt; Foy D. Jordan; Richard J. Bird; B. L. Kootz; Frank M. Mantello; Cant-Hook Ranch, a partnership; Lusk Ranch, a partnership; and Cant-Hook Cattle Co., a partnership, Plaintiffs-Appellants and Cross-Appellees,

v.

FIRST WYOMING BANK N. A., LUSK, First Wyoming Bank N. A., Cheyenne, and the Lincoln Corporation, Defendants-Appellees and Cross-Appellants.

Nos. 77–1638, 77–1639.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 15, 1978.

Decided Feb. 7, 1980.

Rehearing Denied Sept. 3, 1980.

Norman D. Haglund of Kelly, Haglund & Garnsey, Denver, Colo., for plaintiffs-appellants and cross-appellees Foy D. Jordan, Richard J. Bird, B. I. Kootz, Frank M. Mantello, Cant-Hook Ranch, a partnership, Lusk Ranch, a partnership, and Cant-Hook Cattle Co., a partnership.

David J. Carey of Anderson & Carey, Littleton, Colo., for plaintiff-appellant and cross-appellant Helen Stone.

Blair J. Trautwein of Hathaway, Speight & Kunz, Cheyenne, Wyo., for defendants-appellants-appellees and cross-appellants.

Before HOLLOWAY and DOYLE, Circuit Judges, and STANLEY, District Judge.*

HOLLOWAY, Circuit Judge.

In this diversity action plaintiffs-appellants seek review of a judgment notwithstanding the verdict entered by the district court on defendants-appellees' motion. The court set aside a jury verdict which was generally in favor of the appellants. The defendant banks cross-appeal the denial of an alternative motion for a new trial.

Appellants are four individuals—Richard J. Bird, Foy D. Jordan, B. L. Kootz, and Frank M. Mantello; three partnerships—the Cant-Hook Ranch partnership; the Lusk Ranch partnership, and the Cant-Hook Cattle Co. partnership; and Ms. Helen Stone—bankruptcy trustee for one Robert D. Munroe whose whereabouts is unknown. Munroe, Bird, and Jordan were partners of the Cant-Hook Ranch partnership which was formed in 1970. Munroe, Kootz, Mantello, and Jordan were partners of the Lusk Ranch partnership which was formed in 1972. Munroe, Jordan, and Bird were partners of the Cant-Hook Cattle Co. partnership which was formed in 1972. These partnerships, operating mainly out of Colorado and Wyoming, were engaged in

various phases of the cattle raising industry.

Appellants initially filed this suit as a declaratory judgment action seeking a determination of their legal right to and ownership of approximately $361,664.31, plus interest, held in escrow by the defendant-appellee First Wyoming Bank of Lusk (Lusk Bank) and for a legal accounting of the proper amounts owed by the Cant-Hook Cattle Co. partnership to Lusk Bank on certain promissory notes held by Lusk Bank. The complaint also asked for a determination of legal rights to certain collateral held by Lusk Bank, in particular the stock certificate of appellant Jordan which represented ownership of 5,000 shares of Greyhound Corporation stock. The appellees, Lusk Bank, First Wyoming Bank of Cheyenne (Cheyenne Bank), and Lincoln Corporation, a nominee corporation of Lusk and Cheyenne Banks, responded to the complaint by denying the appellants had any legal right to the escrowed funds and by asserting a counterclaim for $455,526.13 against all of the appellants, jointly and severally, on twenty separate promissory notes held by Lusk Bank.[1]

I

## THE FACTUAL BACKGROUND

Viewing all the evidence, together with all reasonable inferences therefrom, in the light most favorable to the party receiving the jury verdict, *Symons v. Mueller Co.*, 493 F.2d 972, 976 (10th Cir.), the evidence tended to show the following facts:

During 1974 and 1975 Lusk Bank, in participation with Cheyenne Bank, conducted several banking transactions with Cant-Hook Cattle Co. and several further transactions with Robert D. Munroe.[2] These

---

\* The Honorable Arthur J. Stanley, Jr., of the District of Kansas, sitting by designation.

1. During trial appellees withdrew two of these promissory notes with total unpaid principal of $7,500.

2. Between October and December of 1973, Lusk Bank had made a number of loans, evidenced by promissory notes to Cant-Hook Cattle Co. These notes were paid off, however, with the proceeds from the loans made to Cant-Hook Cattle Co. in the beginning of 1974 and

transactions involved loans for substantial sums, evidenced by numerous promissory notes payable to Lusk Bank. By the spring of 1975 Munroe had abandoned his business dealings and disappeared from sight after giving quit-claim deeds of his interest in real property, apparently owned by the Lusk Ranch and the Cant-Hook Ranch partnerships, to the Lincoln Corporation, the nominee corporation of the appellee banks. II App. 179–186. Munroe was subsequently placed in involuntary bankruptcy in absentia, and Ms. Helen Stone was appointed as trustee by the bankruptcy court in the District of Colorado.

By early 1975 the Lusk Bank held twenty unpaid promissory notes with a total outstanding principal balance of $455,526.13. Seven (7) of these notes, with a total outstanding balance of $102,359.44 named the Cant-Hook Cattle Co. partnership as maker, and were signed by a duly authorized agent, Jack S. Manion.[3] Four (4) additional notes, with a total outstanding balance of $73,851.15, named the Cant-Hook Cattle Co. partnership as maker, and were signed by one Bill Powell, an employee of Robert Munroe.[4] Each of these eleven notes reflected that the sole borrower or debtor was Cant-Hook Cattle Co. None of these notes made any reference to any of the other partners or partnerships. XX R. 673. Moreover, each of the notes was listed on Lusk Bank's liability ledger as an obligation of Cant-Hook Cattle Co. without any reference to the other partners or partnerships. III App. 12–12A.

The remaining nine (9) notes, with a total outstanding principal of $279,315.54, were in Robert D. Munroe's name as maker.[5] Two of these notes totalling $7,500.00 were also in the name of Munroe's wife and were signed personally by both Munroe and his wife.[6] Seven of these "Munroe" notes were signed in the name of Robert Munroe by Bill Powell. Aside from each of these notes indicating that Munroe was the sole borrower and debtor, each of the notes was listed on Lusk Bank's liability ledger as the sole obligation of Munroe. III App. 30–30A. None of the notes indicated any execution or guarantee by the other partners or partnerships.

In June 1974 Munroe filed with the Wyoming Secretary of State articles of incorporation for an entity called the Torrington Land & Cattle Management Co. (TLC). III App. 223. Munroe, his wife, and an employee of Munroe were the incorporators, the initial directors and the officers of TLC.[7] Prior to and after the incorporation of TLC, Munroe attempted to convince the partners of the three partnerships to consolidate their assets in this Subchapter S corporation to utilize the tax advantages of the corporate structure. II App. 97–100a. Between August and September of 1974, some

thus are not at issue in the present case. See Brief of the Appellants at 12–13.

3. *See* III App. 1A, 2A, 3A, 4A, 5A, 6A, 7A. Munroe had given a power of attorney to Manion to act for him on behalf of the Cant-Hook Cattle Co. partnership. III App. 69; Brief of the Appellants at 13–14. Appellants Cant-Hook Cattle Co. and its partners (Jordan, Bird, and Stone, as trustee for Munroe) acknowledged liability at trial and here on this appeal for the unpaid balance on these seven "Manion" notes in the amount of $102,359.44. The Cant-Hook Ranch partnership, the Lusk Ranch partnership, and the partners of those partnerships in their capacity as partners have denied any liability on these seven Cant-Hook Cattle Co. notes signed by Manion. Brief of the Appellants at 15.

4. At trial, all appellants except Stone as trustee for Munroe, denied liability for these four "Powell" notes. The jury's verdict, however,

found Cant-Hook Cattle Co. liable on the seven "Manion" notes and the four "Powell" notes in the total amount of $176,210.59. II App. 343. Cant-Hook Cattle Co. and its partners (Bird, Jordan, and Stone as trustee for Munroe) do not contest on appeal the propriety of this jury verdict. All the remaining appellants do contest on this appeal the district court's finding of liability on these eleven (11) Cant-Hook Cattle Co. notes. Brief of the Appellants at 15–16.

5. *See* III App. 21A, 22A, 23, 24A, 25A, 26A, 27A, 28A, 29A.

6. These two notes were withdrawn at trial by the appellee banks. *See* note 2 *supra*.

7. In the initial corporate documents no reference was made to any of the appellants other than Munroe. *See* III App. 220–23.

of the individual partners (Bird, Jordan and Kootz) assigned their partnership interests to TLC in return for the TLC stock or TLC promissory notes guaranteed by Munroe.

In October 1974 Bird, Jordan, Kootz, and Mantello discovered that Munroe had placed a large deed of trust against the Cant-Hook Ranch property to secure a personal debt owed to the Conair Air Credit Union and that proceedings had been commenced to foreclose that deed of trust. During this time Jordan, Kootz, and Bird also discovered that Munroe had misrepresented to them the nature of TLC's assets, particularly as to the assets placed in the corporation by Munroe.[8] In November 1974 Bird, Jordan, and Kootz, acting through their attorney, Walter Garnsey, rescinded the assignments of their partnership interests to TLC.[9] Bird and Jordan, as partners in the Cant-Hook Cattle Co. partnership, also formally cancelled various powers of attorney which Munroe had held from them to conduct the business activities of that particular partnership.

By letter dated January 15, 1975, Lusk Bank formally demanded that TLC, the partnerships and their partners pay the outstanding principal and interest owed on all of the eleven Cant-Hook Cattle Co. notes previously described. On that same day Lusk Bank also made a formal written demand on Mr. and Mrs. Munroe, but only for the balance owed on the nine Munroe notes previously described. As late as March 21, 1975, Lusk Bank continued to treat the twenty promissory notes as two separate lines of credit by sending TLC, the partnerships, and their partners an audit request for confirmation of the balances due on only the eleven Cant-Hook Cattle Co. notes. III App. 16. A similar request regarding the nine Munroe notes was sent to Munroe and his wife. III R. 34. Subsequently Lusk Bank asserted liability against all of the partnerships and their partners on all

twenty unpaid notes, claiming that the various notes represented one line of credit for which all of the partnerships and thus all of the partners were jointly and severally liable.

After Munroe's disappearance in the spring of 1975, his several partners attempted to wind up the affairs of the three partnerships in an orderly manner by selling the remaining assets of the partnerships. Because Lusk and Cheyenne Banks, through the Lincoln Corporation, held Munroe's quit-claim deeds to assets owned by the Lusk Ranch partnership and the Cant-Hook Ranch partnership, their cooperation was necessary to effectuate a proper sale. To secure the banks' cooperation appellants agreed that the proceeds of such sales would be temporarily entrusted to Lusk Bank pending a legal determination of liability on the unpaid promissory notes. Under this arrangement, the assets of the Cant-Hook Ranch partnership were sold, resulting in the transfer of $194,765.60 in proceeds to Lusk Bank in the fall of 1975. The assets of the Lusk Ranch partnership brought $166,898.71, which was similarly transferred to Lusk Bank. The Cant-Hook Cattle Co. partnership had no remaining assets.

At the conclusion of the trial, the jury returned a verdict generally in favor of the appellants and against the appellees, finding specifically that Lusk Bank owed the Lusk Ranch partnership the sum of $166,-898.71 plus interest, and further owed the Cant-Hook Ranch partnership the sum of $194,765.60 plus interest. The jury also found that the Cant-Hook Cattle Co. partnership owed the Lusk Bank the sum of $176,210.59 plus interest, representing the balance owed on the eleven notes which had been made in the name of the Cant-Hook Cattle Co. As a result of special interrogatories prepared by the district court, it was clear that the jury found that the open line

8. See II App. 57. The trustee, Stone, testified at trial that no property was ever titled in TLC's name. II App. 86–87, 91.

9. See II App. 66–68 (Jordan), 267 (Bird); III App. 153 (Bird), 218 (Kootz), 257 (Jordan),

XVII R. 157 (Kootz). These rescissions were formally accepted by Munroe individually and on behalf of TLC in December 1974. See III App. 258–60.

of credit established at Lusk Bank was created for the use and benefit of Cant-Hook Cattle Co. partnership and not the other partnerships. II App. 342–43. *See* Appendix A.

Finding the jury verdict contrary to the evidence and the law, the district court set it aside and entered a judgment notwithstanding the verdict against all the appellants, jointly and severally, in the amount of appellee Lusk Bank's counterclaim for $448,026.13, plus interest at the rate of ten percent, costs, and attorney's fees in the amount of $10,000. In its order the district court basically found, *inter alia*, that the evidence overwhelmingly established that the three partnerships were engaged in a joint cattle raising venture; that a line of credit was established by Lusk Bank for the partnerships' livestock operation and that $448,026.13 remained unpaid on this line of credit; that despite borrowing limitations in the partnership agreements, Munroe, as a partner in all three partnerships, frequently exceeded his authority; that all the partners were aware of Munroe's actions in excess of his authority but had acquiesced and accepted the benefits of those actions and thus were estopped from asserting the partnerships' borrowing limitations.

Further the court found that each partner had transferred his partnership interest to TLC in return for corporate stock and that TLC had adopted by written contract the indebtedness evidenced by the promissory notes signed by Munroe, Manion, or Powell. The court also found that the appellants' attorney, Walter Garnsey, who had a power of attorney from the partners, bound the partners and partnerships when he assured Lusk Bank by letter that the partners would meet their obligations in a timely manner. Additionally the court concluded that the Jordan stock certificate was pledged to secure loans made by Lusk Bank to the partnerships and that the partners were jointly and severally liable for the unpaid portion of the outstanding promissory notes, despite the possible misapplication of the funds by Munroe. I App. 58–60. It is from this judgment notwithstanding the jury verdict that appellants have brought this timely appeal.

Appellants' basic contentions on appeal are that the trial court erred: (1) in setting aside the jury verdict and entering a judgment n. o. v. against all of the appellants; (2) in refusing to direct a verdict in favor of appellant Jordan on the issue of whether his stock certificate was pledged as collateral for only one of the promissory notes or, alternatively, if a directed verdict was not required, in failing to permit the jury to determine which of the eighteen promissory notes was collateralized by the Jordan stock certificate.

In the cross-appeal the appellees claim that the trial court abused its discretion (1) in failing to grant their alternative motion for a new trial, the standard for granting a new trial being less onerous than that for granting a judgment n. o. v.; (2) in failing to give requested jury instructions on their theory of corporate adoption; and (3) in submitting to the jury a revised verdict form after the jury had retired for deliberations.

We turn first to the claimed error in granting the appellees a judgment notwithstanding the verdict.

## II

### THE JUDGMENT N. O. V. ISSUE

The appellants argue that the district court's decision to set aside the jury verdict and the answers to special interrogatories, which were generally in favor of the appellants, and to enter a judgment n. o. v. against all the appellants was not justified by the record evidence or on any proper legal basis. Conversely, the appellees contend that the judgment n. o. v. was proper because the evidence supports: (a) the joint venture—one line of credit theory; (b) the authority of Munroe, Manion and Powell *to* bind the joint venture on the obligations; (c) the theory that their actions were ratified by the plaintiffs-appellants; (d) the theory that attorney Garnsey ratified their actions for the appellant parties; and (e) the theory of "corporate adoption."

It is well established, of course, that "a judgment n. o. v. is justified only if the evidence is so overwhelmingly preponderant in· favor of the movant as to admit of no other reasonable conclusion." *Derr v. Safeway Stores, Inc.*, 404 F.2d 634, 636 (10th Cir.). *See also Symons v. Mueller Co.*, 493 F.2d 972, 976 (10th Cir.) (evidence must point only in one direction and not be susceptible to any other reasonable inference which would sustain the position of the party opposing the motion). And "it is an exceptional case wherein the party having the burden of proof is entitled to a judgment n. o. v." *Moore v. Shultz*, 491 F.2d 294, 299 (10th Cir.), *cert. denied*, 419 U.S. 930, 95 S.Ct. 203, 42 L.Ed.2d 161. Thus our review is narrowly limited to deciding whether the evidence so "overwhelmingly" supported any of the appellees' theories of recovery that a judgment n. o. v. was justified.

### a. The joint venture—one line of credit theory

The appellees claim that Cant-Hook Ranch, Cant-Hook Cattle Co. and Lusk Ranch were engaged in a joint venture to raise cattle; that *one* line of credit was established by Lusk Bank to enable the partnerships to run the joint cattle operation; that Munroe, Manion, and Powell had the authority, express and implied, to act on behalf of the joint venture to incur indebtedness on this line of credit; and that these individuals did in fact take out loans on behalf of the appellant partnerships, the proceeds of which generally benefited the joint venture. This is the primary contention relied on to justify the judgment n. o. v. and the entry of the $448,026.13 judgment on the counterclaim of the banks.

As a general rule the substantive law of partnerships is applicable in determining the rights and liabilities of joint venturers and third parties. *Wood v. Western Beef Factory, Inc.*, 378 F.2d 96, 99 (10th Cir.); *see also P & M Cattle Co. v. Holler*, 559 P.2d 1019, 1021 (Wyo.). We have also found elementary the proposition that one joint venturer can bind another joint venturer in matters that are within the scope of the joint enterprise, but that a joint venturer who acts in contravention of a restriction on his authority cannot bind the other joint venturers to persons who have knowledge of the restriction. *Wood v. Western Beef Factory, Inc., supra*, 378 F.2d at 98–99. *See generally* Wyo.Stat. § 17–13–301. Equally important in evaluating this theory of recovery is the principle that the existence of a joint venture is "a question of fact and preeminently one for the finder of fact." *P & M Cattle Co. v. Holler, supra*, 559 P.2d at 1024. Moreover, since the joint venture is a contractual relationship, the intent of the parties is controlling and is to be gleaned, in the absence of an express agreement, from the conduct, the surrounding circumstances, and the transactions between the parties. *Id.* at 1022. *See also Freese v. United States*, 455 F.2d 1146, 1151 (10th Cir.), *cert. denied*, 407 U.S. 879, 93 S.Ct. 85, 34 L.Ed.2d 134.

While there is admittedly no written agreement showing the existence of a joint venture between the partnerships (Brief of the Appellees at 32), the banks say that the facts proven at trial amply support this theory of recovery.[10] Likewise, the banks point to facts in the record which tend to support the position that Munroe acted in the partnerships' behalf in setting up a single line of credit and that promissory notes were created with the intent to bind the partnerships.[11] However, the banks

10. For example, the appellees suggest that the joint venture is proven by the fact that the Cant-Hook Cattle Co. cattle grazed on Cant-Hook Ranch land and were fed in the Lusk Ranch feedlot; that one partnership's bills were often paid by one of the other partnerships; that Lusk Ranch and Cant-Hook Cattle Co. shared an employee (Jack Manion); that Cant-Hook Cattle Co. and Lusk Ranch used a common letterhead; and that all the partnerships used the same accountant who testified that the partnerships were interwoven and were operating as one entity. *See* Brief of the Appellees at 32–33.

11. To support this position banks primarily rely on the trial testimony of Mr. Pearson, the president of Lusk Bank at the time the loans were made. Pearson's testimony related to his own

must do more than merely show that evidence exists in the record to support their position. They must demonstrate that the totality of the evidence cannot lead to any other reasonable conclusion. We hold that the banks have not sustained this heavy burden with respect to this theory.

 Ample evidence exists in the record to support the jury's rejection of appellees' joint venture—one line of credit theory, on which the banks bore the burden of proof.[12] From the voluminous amounts of documentary and testimonial evidence, the jury could have easily found that each partnership had a separate partnership agreement (III App. 70–72), had separate property, maintained separate books and records (II App. 197–99; XVIII R. 404, 423–24), held separate federal employer identification and tax numbers (II App. 100c–101), and filed separate tax returns (II App. 102). Moreover, there was no evidence of any sharing of profits or losses between the separate partnership entities—a factor which is indicative of a joint venture. *P & M Cattle Co. v. Holler, supra,* 559 P.2d at 1023. Nor is there any significant indication that each partnership had joint control or a right to exercise some degree of control over the business activities of the other partnerships. *See Sasportes v. M/V Sol De Copacabana,* 581 F.2d 1204, 1208 (5th Cir.); *House v. Mine Safety Appliances Co.,* 573 F.2d 609, 620 (9th Cir.), *cert. denied, Silver Dollar Mining Co. v. PVO International, Inc.,* 439 U.S. 862, 99 S.Ct. 182 (1979); *Detachable Bit Co. v. Timken Roller Bearing Co.,* 133 F.2d 632, 635 (6th Cir.); *see generally* 46 Am.Jur.2d *Joint Ventures* § 12 (1969). Merely because the partnerships maintained business relationships with each other[13] is not necessarily conclusive, as the banks apparently suggest, of the existence of a joint venture, so long as the business transactions were conducted on an arms-length basis. Likewise, the existence of some overlapping activities and resources among the partnerships, such as the use of a shared employee and of the same accountant, is not controlling on the issue of the joint venture's existence. Rather, these factors are merely evidentiary matters to be weighed by the jury in determining the intent of the parties with regard to their relationship. *P & M Cattle Co. v. Holler, supra,* 559 P.2d at 1022–23.

In a similar vein the evidence relating to Lusk Bank's extension of credit did not overwhelmingly establish that a single line of credit had been created for the benefit of all three partnerships who would be jointly and severally liable for any loan made on that line of credit. To the contrary, there was a significant amount of evidence from which the jury could conclude that several different lines of credit had been established. As stated before, the contested promissory notes were unambiguous on their face, naming the specific debtor on each note. The security agreements supporting each note consistently referred to the Cant-Hook Cattle Co. as debtor on the eleven Cant-Hook Cattle Co. notes, *see e. g.,* III App. 1C, 3B, 4C, and to only Munroe as debtor on the seven Munroe notes, *see, e. g.,* III App. 22A, 23, 24A. Participation certificates sent to other banks on several of the notes followed the same pattern. *See, e. g.,* III App. 1B, 2B, 22B.

Equally significant are Lusk Bank's own internal documents, such as commercial loan ledgers and liability ledgers, which completely segregated the loans made to

impressions of the transactions and to statements made by Munroe. *See* Brief of the Appellees at 39–41.

**12.** The burden of establishing the existence of a joint venture is upon the party asserting that the relationship exists. *See generally* 46 Am. Jur. *Joint Ventures* § 69 (1969); 48 C.J.S. *Joint Adventures* § 12(h) (1947). *See also United States ex rel. Altman v. Young Lumber Co.,* 376 F.Supp. 1290, 1297 (D.S.C.)

**13.** For example, the evidence indicates that the Cant-Hook Cattle Co. partnership and the Lusk Ranch partnership entered into a written contractual arrangement for the grazing of Cant-Hook Cattle Co. cattle on Lusk Ranch property. *See* III App. 73; II App. 29–30, 284. *See also* XVI R. 61; XX R. 747, 765. At the same time, however, Lusk Ranch had similar business arrangements with other cattle owners. *See* II App. 28–29; III App. 184.

Cant-Hook Cattle Co. and to Munroe, and which failed to make any reference to the other partners or partnerships. *See, e. g.,* III App. 12–13, 30–30A; III R. 31. Despite contrary trial testimony from the former Lusk Bank president, Mr. Pearson, the bank's own written correspondence with Munroe and with the appellants indicates that several different lines of credit were involved in the transactions occurring between January 1974 and February 1975.[14]

The banks have relied primarily on the trial testimony of Mr. Pearson to support their theory. Yet his actions throughout the period of the loan transactions appear to be inconsistent with his claim that all the loans were part of one line of credit. Beginning in May 1974 Pearson made substantial loans in Munroe's personal name, while continuing to make additional loans in the name of Cant-Hook Cattle Co. Mr. Pearson once conducted separate transactions for Munroe and Cant-Hook Cattle Co. on the same day. *See* III App. 8–9, 25–26. When the loans to Munroe were made in May 1974, Pearson only obtained the personal guarantee of Munroe's wife, and not those of his partners. *Id.* at 39; II App. 140. In fact, throughout the entire course of these loan transactions, Pearson never obtained any written or oral confirmation from any of the appellants of Munroe's authority, *see* II App. 192–97, 207, 211, 229, despite being aware of facts which indicated that Munroe did not have extensive borrowing authority, *see id.* at 189–97, 209–10, and that he may have used the proceeds of at least one loan made in his name to satisfy a personal debt

at another bank. *See id.* at 219–20, 223–26; *see also id.* at 236, 306–09.

Considering the extended time period over which the transactions were made and the significant dollar amount involved, the conduct of Pearson, who was an experienced banker, could have easily been viewed by the jury as being incongruous with his subsequent trial testimony that he understood that the loans were made to all the partners and partnerships, rather than to just Munroe and Cant-Hook Cattle Co.[15] We cannot say that the jury acted unreasonably in apparently giving more credence to Pearson's contemporaneous actions which tended to indicate that *separate* lines of credit had been established by Lusk Bank than to his trial testimony which indicated that all the loans were part of one line of credit. *See P & M Cattle Co. v. Holler, supra,* 559 P.2d at 1023.

In sum, we must hold that the evidence was not so overwhelmingly preponderant as to admit of no other conclusion except the position taken by the banks on the one line of credit theory. Thus the entry of judgment notwithstanding the verdict cannot be sustained on that theory of the banks as a matter of law since factual issues on this serious question were clearly involved, and were resolved against the banks by the jury.

b. *The banks' theory that Munroe, Manion and Powell had authority to bind the partners and partnerships*

The appellees further argue `that "the evidence shows overwhelmingly that Munroe, Manion and Powell had the ex-

---

14. For example, a letter from Pearson to Munroe in December 1974 indicated that Lusk Bank had extended Munroe "a personal line of credit" to pay off loans from another bank. *See* III App. 76. Additionally there were the Bank's demand letters and audit requests, referred to earlier, which clearly separated the Cant-Hook Cattle Co. notes and the Munroe notes. *See also Id.* at 75, 140, 178A.

15. In some respects Mr. Pearson's testimony was not directly contradicted. We must, therefore, keep in mind the principle that testimony as to a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached, and in no way discredited by cross-ex-

amination, must be taken as true. *See Chicago, Rock Island and Pacific Ry. Co. v. Howell,* 401 F.2d 752, 754 (10th Cir.). However, that was not the case here with respect to Pearson's testimony because documents, including his own writings, and the circumstances noted in the text did much to discredit Pearson's testimony on the one line of credit theory. Even where the evidence is for the most part not conflicting, this alone does not warrant taking the issues from the jury; where the issues turn on the significance to be attached to various facts and inferences reasonable persons might draw, the questions are for the jury. *Wright v. Marzo,* 427 F.2d 907, 909–10 (10th Cir.).

press, implied and apparent authority to bind the joint venture" when borrowing funds from Lusk Bank. Brief of the Appellees at 35.[16] To support this claim, an issue on which they had the burden of proof at trial,[17] the banks point to the power of attorney which appellants Bird and Jordan gave to Munroe (III App. 96) and to the powers of attorney which Munroe subsequently gave to Manion (*id.* at 68) and Powell (*id.* at 69). Because Bird, Jordan, and Munroe were the sole partners in Cant-Hook Ranch and Cant-Hook Cattle Co., and Jordan and Munroe controlled sixty percent (60%) of Lusk Ranch, the appellees conclude that Munroe had "working control of the three partnerships." Brief of the Appellees at 36. Consequently when Pearson made loans in Munroe's and Cant-Hook Cattle Company's names based upon the powers of attorney (II App. 110–13, 195–96) and upon Munroe's claim that he represented the three partnerships (II App. 109a, 112–13, 119, 129–30, 141–42, 154), then those entities were bound by those representations. Brief of the Appellees at 34–38.

 We have already noted that a partner is an agent for the partnership and may bind the partnership when acting within the scope of the partnership business "unless the partner has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he

has no authority." Wyo.Stat. § 17–13–301(a). Whenever a person deals with an agent knowing that the agent is authorized to act on behalf of the partnership by virtue of a power of attorney, then the person is bound to ascertain and know the character and extent of the power of attorney under which the agent assumes to act. *See De-Boer Constr., Inc. v. Reliance Ins. Co.,* 540 F.2d 486, 490 (10th Cir.), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753; *Chicago Title Ins. Co. v. Progressive Housing, Inc.,* 453 F.Supp. 1103, 1107 (D.Colo.); *see also* Restatement (Second) of Agency § 167 (1958). Moreover, if the person has knowledge that the agent has limited authority, then he may not rely on the theory of apparent authority to enforce liability against the partnership. *See DeBoer Constr., Inc. v. Reliance Ins. Co., supra,* 540 F.2d at 491; *cf. Cross v. Amoretti,* 44 Wyo. 175, 9 P.2d 147, 148–49.

 In this case there was substantial evidence that before Pearson authorized the contested loans he had seen the partnership agreements and the power of attorney from appellants Jordan and Bird to Munroe, that he was aware of the borrowing limitation in each of the partnership agreements,[18] and that beyond the Jordan-Bird power of attorney he failed to obtain any further oral or written authorization for Munroe or his appointees (Manion and Powell) to borrow on behalf of the partnerships.[19] *See* II App.

16. The district court did not actually rely on a theory of express, implied, or apparent authority as a basis for his judgment n. o. v. The court instead said that (I App. 58):

 all the partners were aware that Robert D. Munroe had frequently exceeded his authority as set forth in the partnership agreements and the evidence discloses that the partnerships had acquiesced and accepted the benefits of such acts and cannot now assert the limitations contained in said agreements;

 We will, however, address the claim of express, implied and apparent authority because the banks as appellees argue this proposition as a basis for upholding the judgment n. o. v. We discuss the acquiescence and acceptance of benefits points in Part 1(c), *infra.*

17. In their appellate brief, the banks apparently admit that they had the burden of proving the agency relationship and the scope of the

agent's authority. Brief of the Appellees at 34, citing *Ulen v. Knecttle,* 50 Wyo. 94, 58 P.2d 446, 449.

18. Each partnership agreement contained identical borrowing limitations which precluded any single partner from borrowing on the partnership's behalf more than $500 without the express written consent of the other partners. III App. 70–72.

19. The evidence indicates that prior to making sizable loans in Munroe's name in May 1974 Pearson requested that "the parties involved" give personal guarantees to Lusk Bank. The evidence shows that subsequent loans were made with only one guarantee being given, that of Munroe's wife. II App. 140; III App. 39. That guarantee apparently was given in consideration of Lusk Bank's extension of credit, past and future, to Robert D. Munroe. III App. 39.

189–98. The evidence also shows that the Jordan-Bird power of attorney to Munroe was limited to the transaction of business on behalf of Cant-Hook Cattle Co.[20] II App. 16–17, 76a; III App. 96.

Thus the judgment n. o. v. cannot be sustained on the theory that the record overwhelmingly demonstrates that Munroe, Manion and Powell had authority "to bind the joint venture" and hence the partnerships.

c. *The banks' theory that appellants are bound by having acquiesced and accepted the benefits of Munroe's actions and may not rely on any limitations on Munroe's authority to borrow*

The district court found that the evidence overwhelmingly established that all the appellants knowingly "acquiesced and accepted the benefits" of Munroe's actions which were in excess of the authority granted in the partnership agreements. 1 App. 58. This, the court concluded, prevented the appellants from asserting the borrowing limitations against the banks. *Id.*

 Ratification is "the subsequent adoption and affirmance by one person of an act which another, without authority, has previously assumed to do for him, while purporting to act as his agent." *Farmers' State Bank v. Haun*, 31 Wyo. 201, 222 P. 45, 51 (1924). *Accord* Restatement (Second) of Agency § 82 (1958). Admittedly the appellees had the burden of proving that the appellants had ratified the actions of Munroe and his appointees. *See McConnell v. Dixon*, 68 Wyo. 301, 233 P.2d 877, 891. "Included in this burden is proof that the principal had full and complete knowledge of all the material facts of the transactions, and in addition thereto that the principal intended to ratify the acts and transactions of his agent." *Kover v. Hufsmith*, 496 P.2d 908, 910 (Wyo.) (citations omitted). *See generally* Restatement (Second) of Agency § 91 (1958); 2A C.J.S. *Agency* §§ 73, 75 (1972).[21]

 While it has been said that the knowledge required as a basis for ratification must be actual rather than constructive, the circumstances may indicate actual knowledge. *See Farmers' State Bank v. Haun, supra*, 222 P. at 54; and *see generally* 2A C.J.S. *Agency* § 73(c) (1972). Likewise, the intent on the part of the principal to ratify the unauthorized acts of the agent may be proven either directly from a written instrument or express statement, or indirectly by inference from other conduct. *See generally Flournoy v. Hewgley*, 234 F.2d 213, 216 (10th Cir.); *Waisner v. Hazbrouck*, 34 Wyo. 61, 241 P. 703, 705; 2A C.J.S. *Agency* § 75 (1972).

 In this case, the banks attempt to justify the judgment n. o. v. by arguing that the appellants were aware of facts which would have led a person of ordinary prudence to investigate further and that the failure to make such investigation constituted evidence of ratification. Additionally they claim that the appellants, knowing the material facts, received and retained the benefits of the unauthorized actions and thereby manifested an intention to ratify the same. Brief of the Appellees at 44–49. While there is evidence which tends to support appellees' claims, we cannot say after reviewing the evidence that it is so overwhelming that a judgment n. o. v. could be justified on this basis.[22]

That document does not mention any of the partnerships or individual partners.

20. It is the policy of Wyoming courts "to construe powers of attorney strictly, and to hold the principal not bound unless the authority is exercised within the undoubted limits prescribed by the principal." *Luikart v. Boland*, 45 Wyo. 461, 21 P.2d 542, 543 (1933).

21. While the knowledge required for ratification of an agent's unauthorized acts need not embrace every detail of the transaction, knowledge of material facts is essential. *See generally Crane Co. v. James McHugh Sons, Inc.*, 108 F.2d 55, 59 (10th Cir.).

22. For example, while Pearson testified that none of the individual parties objected to Munroe's activities, Pearson also said that he had never contacted Jordan, Bird, Kootz, or Mantello to confirm Munroe's actions which were purportedly done on their behalf. II App. 205, 207, 211, 229. Bird testified that while he was aware of some of the loans that Cant-Hook Ranch had with another bank, he was not

There are additional reasons why the entry of judgment n. o. v. cannot be justified as a matter of law on this theory. Generally the doctrine of ratification does not apply where the third party intends to deal, not with the principal, but rather with the agent in the agent's individual capacity. *See, e. g., Pullen v. Dale,* 109 F.2d 538, 539, 9 Alaska 643 (9th Cir.); *State v. Sundling,* 128 Mont. 596, 281 P.2d 499, 504; *Blackwell v. Kercheval,* 29 Idaho 473, 160 P. 741, 744–46; *see also* Restatement (Second) of Agency § 85 (1958); 2A C.J.S. *Agency* §§ 71–72, 86(b) (1972). From the jury's answers to the special interrogatories it is readily apparent that they found that Lusk Bank and Pearson had set up a separate personal line of credit for Munroe, and the record amply supports this conclusion. Thus, with respect to the seven (7) Munroe notes, the judgment n. o. v. cannot be sustained on the ratification theory.

Ratification of an agent's unauthorized acts has also been rejected as a theory of recovery where the person who deals with the agent had knowledge that the agent lacked authority to make the agreement. *See e. g., Allen v. Greenland Oil Co.,* 124 Kan. 1, 256 P. 1004, 1005; *see also* 2A C.J.S. *Agency* § 71 (1972); *see generally* Restatement (Second) of Agency § 85, Comment a, Illustration 1 (1958). Here there is ample evidence as noted earlier from which it could be concluded that Pearson was aware of Munroe's deficiency in authority to act on behalf of Lusk Ranch partnership and Cant-Hook Ranch partnership. Thus as to the partners in those partnerships, the judgment n. o. v. also cannot be sustained on a ratification theory as to the eleven (11) Cant-Hook Cattle Co. notes.

In sum, we hold that the evidence was not so overwhelmingly preponderant as to admit of no other conclusion except the position taken by the banks on the agency issue. Both the authority and ratification issues were submitted to the jury under instructions which were not objected to by either side. The evidence presented factual questions which the jury resolved against the appellee banks and we cannot say, as a matter of law, that its verdict was in error. Thus the judgment n. o. v. cannot be sustained on the authority and ratification theories advanced by the banks.

### d. *Attorney ratification of the indebtedness*

In its decision granting the banks a judgment n. o. v., the district court found that the evidence overwhelmingly established that the appellants' trial attorney, Walter Garnsey, had a power of attorney from each of the individual partners except Munroe, that the power of attorney gave Garnsey the authority to bind the partners, and that Garnsey did so by his letter (III App. 176) to Lusk Bank and Pearson "in which he assures the bank that the partners would meet their obligations in a timely manner." I App. 59. On appeal, the banks have asserted an identical argument. Brief of the Appellees at 50–51.

▪ ■ Without a doubt, appellants Bird, Jordan, Kootz, and Mantello gave Garnsey broad powers of attorney. II App. 245–49; III App. 174 (Jordan), 215 (Kootz), 216 (Mantello); XVI R. 49 (Bird). These pow-

---

aware of how the loans were paid off, XVI R. 84; and that he did not know whether the proceeds of many of the Lusk Bank's loans went to benefit the Cant-Hook Ranch, the Lusk Ranch, or the Cant-Hook Cattle Co., *id.* at 72–74. Jordan testified that he did not know that Cant-Hook Cattle Co. had borrowed $390,000, XVII R. 272; that he did not know as a fact that bills of all the partnerships were paid from proceeds of loans made by Lusk Bank, *id.* at 244–45; and that he did not know that Munroe allegedly borrowed money from Lusk Bank for all the partnerships based on the power of attorney which he had given to Munroe, *id.* at 246–47. The evidence further indicated that

some of the proceeds of the Munroe notes went directly to pay off personal debts of Munroe having no relation to the other individual partners or partnerships, II App. 233–36, 306–09; XX R. 744–47, Brief of the Appellee at 14, 16; and that some of the proceeds of the Munroe notes went to pay the accrued interest on the outstanding Munroe notes, III App. 25A, 26A, Brief of the Appellees at 16–17. More importantly, the banks have not pointed to any evidence which would conclusively show that the other partners had any knowledge of what Munroe did with the proceeds of loans made in his name.

ers were given in May 1975 to enable Garnsey to act for the individuals in the liquidation of the partnership assets. II App. 245–46. However, the letter which appellees assert bound the appellants to the indebtedness created by Munroe and his appointees (Manion and Powell) was written on November 15, 1974, over five months *before* the powers of attorney were given to Garnsey. Thus at the time that Garnsey allegedly "ratified the indebtedness" he was acting as an attorney for the individual partners but he had no powers of attorney to act as an attorney in fact in dealing with partnership obligations.

Moreover the jury heard testimony concerning the granting of the powers of attorney to Garnsey, *see e. g.*, II App. 245–49; XVII R. 173–77 and had substantial documentary evidence before it relating to this issue, *see, e. g.*, III App. 176–79 (correspondence between Garnsey and Lusk Bank); *id.* at 174, 215–16 (powers of attorney). That evidence did not overwhelmingly show an intent that Mr. Garnsey was "ratifying the indebtedness" so that all the appellants were bound for all the $448,026.13 indebtedness.

The jury was specifically instructed on the concepts of ratification and power of attorney. II App. 317–18. We cannot say that the jury's rejection of this ratification theory was without a plausible basis,[23] or that the evidence was overwhelmingly preponderant in favor of the appellees' theory of attorney ratification so as to justify a judgment n. o. v. Thus the judgment n. o. v. cannot be sustained on this theory.

e. *The theory of corporate adoption of partnership indebtedness*

Appellees' final argument in support of the judgment n. o. v. is based on a theory that TLC adopted by express and implied action the indebtedness of the three partnerships. Brief of the Appellees at 17, 21, 23–31. The trial judge did ground his judgment n. o. v. in favor of the banks in part on the basis of a written corporate adoption of the indebtedness evidenced by the notes signed by Munroe, Manion and Powell.

Because we treat this claim more fully in our discussion of appellees' cross appeal, *see* Part III *infra*, we need only say at this point that we have examined the purported "adoption contract" (Appendix B hereto); (III App. 101), and the testimony surrounding the alleged "adoption," and have concluded that the evidence was not so overwhelmingly preponderant in favor of the appellees' position that a judgment n. o. v. was justified. Consequently the judgment n. o. v. cannot be sustained on a theory of corporate adoption.

In sum, we have examined all of the banks' theories attempting to justify the setting aside of the jury verdict and the entry of judgment n. o. v. and have considered the relevant documents and testimony. For the reasons we have stated we must hold that the banks' theories are not so overwhelmingly supported by the record that a judgment n. o. v. was justified. Consequently the entry of judgment for the appellee banks on that basis was error. Before determining whether an entry of judgment on the jury's verdict and answers to the special interrogatories should be directed we must consider the banks' theory of corporate adoption and related arguments which are primarily asserted by the cross-appeal, to which we now turn.

### III

### CROSS–APPEAL OF THE BANKS

In their cross-appeal (No. 77–1639), the banks claim that the trial court committed reversible error: (a) in failing to give requested jury instructions on their theory of TLC's adoption of the partnerships' indebtedness; (b) in failing to grant their alternative motion for a new trial after granting them judgment n. o. v.; and (c) in submitting to the jury a revised verdict form after the jury had retired for deliberation. Brief of the Appellees at 52–56.

---

**23.** The question of intent to ratify is generally an issue of fact for the jury. *See G & R Corp.* *v. American Security & Trust Co.*, 173 U.S.App. D.C. 215, 222, 523 F.2d 1164, 1171 (D.C. Cir.).

### a. *The corporate adoption theory*

Prior to submitting the case to the jury, the district court concluded, after a timely objection by the banks, that it would not give an instruction on the banks' theory of "corporate adoption" [24] because he thought that "everybody agreed that the corporation wasn't in this." II App. 324–35. Notwithstanding his refusal to submit the question to the jury, the district court later determined in granting the banks a judgment n. o. v. that TLC was created to consolidate the three partnerships; that TLC "adopted by written contract indebtedness evidenced by the notes signed by Munroe, Manion or Powell"; and that each individual partner had transferred his partnership interests to TLC in return for TLC stock. I App. 59.[25] The banks claim on this appeal that the "substantial evidence in the record" supporting their corporate adoption theory, buttressed by the district court's findings in the judgment n. o. v., compels the conclusion that prejudicial error occurred when the trial court failed to instruct the jury on this aspect of the banks' case. Brief of the Appellees at 53.

Various responses to this theory have been raised by the individual partners and partnerships. Initially they claim that the "corporate adoption" theory constitutes a new theory of recovery which was not pursued at pretrial or at trial and thus the trial court was justified in rejecting the proffered instructions. To support this contention, they point: (1) to the banks' failure to name TLC as a party to their counterclaim; (2) to the banks' theories, presented in the pretrial order, which apparently were based on the joint and several liabilty of the plaintiffs (I App. 21–23); (3) to the banks' failure to take affirmative steps at trial to amend the pretrial order; (4) to the trial court's rejection of the banks' instructions in part because the corporation was not a part of the proceedings; and (5) to the trial court's judgment n. o. v. which decreed joint and several liability on the partners and partnerships. *See* Brief of the Appellants at 52–54, 57–58; Reply Brief of the Appellants at 18–22. On the merits of the issue, they argue that the record is devoid of evidence supporting an express or implied corporate adoption of the partnership indebtedness and that consequently the trial court was justified in refusing to give the requested instructions. *See* Reply Brief of the Appellants at 15–17.

It is true, that the pretrial order measures the dimensions of the law suit at trial and on appeal. *Hodgson v. Humphries*, 454 F.2d 1279, 1281 (10th Cir.). It is equally fundamental, however, that the pretrial order should "be liberally construed to embrace all of the legal and factual theories *inherent* in the issues defined therein." *Century Refining Co. v. Hall*, 316 F.2d 15, 20 (10th Cir.) (emphasis added).

---

24. The banks, at trial and in their appellate brief, appear to use the terms corporate "ratification" and "adoption" interchangeably. *See, e. g.,* II App. 324; Brief of the Appellees at 17, 24, 27–28, 31. Wyoming case law has clearly established that these two terms are separate and distinct. As the Wyoming Supreme Court noted in *Rowray v. Casper Mutual Bldg. & Loan,* 48 Wyo. 290, 45 P.2d 7, ratification "is the acceptance of a previously unauthorized contract . . .. [It] implies an existing person on whose behalf the contract might have been made at the time." *Id.* 45 P.2d at 13. Adoption, on the other hand, "may be made by a person who had no legal existence at the time the contract was made on his behalf . . .. One may, if he will, adopt for his own use the terms of any contract that suits his purpose; [however] he may ratify a contract only when it was originally made for him without authority." *Id.* Because TLC was not in existence at the time most of the promissory notes were

created and because those notes were clearly not made on behalf of TLC, a theory of ratification is inapplicable. Consequently we will treat the banks' argument as relating to an adoption theory only. *See generally* 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 207 at 741 (Rev. ed. 1974).

25. This last finding is partly in error as the banks admit in their appellate brief. The evidence *is* clear that Mantello, a partner in Lusk Ranch, never assigned his partnership interest over to TLC. II App. 80; Brief of the Appellees at 15, 26. It is also clear that Bird did not receive corporate stock in return for his partnership interests, but rather received a TLC promissory note which was guaranteed personally by Munroe, TLC's president. II App. 260–62, 267–68; III App. 153; Brief of the Appellees at 26.

After reviewing the pretrial order we believe that under a liberal construction, the banks' theory of corporate adoption was properly presented.[25] Our conclusion is further supported by reference to several other pretrial documents in which the banks indicate that their legal theories of recovery include one of ratification or adoption by the business entity TLC. *See* I App. 12 (defendants' pretrial memorandum), 44 (Brief in resistance to plaintiffs' motion in limine). In addition, we note that testimony and documents were offered at trial relating to the transfer of partnership interests to TLC, to the rescissions of these transfers by the individual partners, and to the purported "adoption" contract, Appendix B to this opinion, between Munroe, as president of TLC, and Pearson. *See, e. g.,* II App. 43, 47, 66–68, 80, 152–59, 260–62, 267; III App. 101, 153, 172 217–18, 217, 257–60. Thus we are convinced that the pretrial order, properly construed, inherently presented the issue of corporate adoption and thus cannot be the basis for denying review of this issue on appeal. *See also Perfection-Cobey Co. v. City Tank Corp.,* 597 F.2d 419, 420–21 (4th Cir.) (where parties actually litigate without objection issues not raised in the pretrial order, little reason exists for enforcing pretrial order); *Mains v. United States,* 508 F.2d 1251, 1259 (6th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652; *Monod v. Futura, Inc.,* 415 F.2d 1170, 1173–74 (10th Cir.); *Bucky v. Sebo,* 208 F.2d 304, 305 (2d Cir.).

Likewise we cannot agree that the banks' theory of corporate adoption by TLC is precluded merely because they failed to name TLC as a party to their counterclaim. It is true that ordinarily a creditor must seek a judgment and execution against the debtor prior to pursuing the equitable remedy of following the assets of the debtor into the hands of the transferees. *See Pierce v. United States,* 255 U.S. 398, 402–03, 41 S.Ct. 365, 65 L.Ed. 697. Nevertheless, if the debtor is a corporation which has to cease to exist, it is entirely proper for the validity of the debt to be presented and determined in an equitable action to enforce the liability against a stockholder or distributee. *Stewart v. United States,* 327 F.2d 201, 203 (10th Cir.); *McWilliams v. Excelsior Coal Co.,* 298 F. 884, 886 (8th Cir.); *see generally* F.R.Civ.P. 18(b), and the principle also applies where the corporation is either insolvent or has suspended business. *See Harle-Haas Drug Co. v. Rogers Drug Co.,* 19 Wyo. 35, 113 P. 791, 793. This exception to the general rule is premised on the notion that "equity will not require a useless thing, or insist upon an idle formality." *Stewart v. United States, supra,* 327 F.2d at 203.

In this case the banks' equitable theory of recovery against the partners and partnerships is based on the "trust fund" doctrine.[26] Brief of the Appellees at 30. In Wyoming this doctrine "is confined to the case of a corporation which is either insolvent or has suspended business, and whose assets have gone into the possession of a court of equity, in a proper proceeding for that purpose, to be administered for final settlement and distribution." *Harle-Haas*

---

**25.** In its statement of legal theories, the banks claimed that Munroe and the individual plaintiffs formed various business ventures including TLC and that "the individual plaintiffs, such business entities, and/or their agents authorized and/or acquiesced in and/or ratified such promissory notes." I App. 22.

**26.** The partners and partnerships contend that even if the banks' theory of corporate adoption was properly presented in the pretrial order and could be supported by the record, the equitable claim on a trust fund theory was not presented and therefore cannot be the basis of recovery by the banks. Reply Brief of the Appellants at 18–22.

Admittedly the banks' statement of theories in the pretrial order did not contain terminology which would make it readily apparent that the bank intended to pursue a trust fund theory. However, in the pretrial order claims were asserted against the partners and partnerships that TLC adopted the partnerships' indebtedness, and that several of the individual partners had transferred their partnership interests to TLC. I App. 22–23. Moreover at trial evidence was admitted showing the rescissions of those transfers. We feel the record thus permitted the banks to pursue the equitable remedy at trial and on appeal.

*Drug Co. v. Rogers Drug Co.,* 19 Wyo. 35, 113 P. 791, 793 (1911).[27] The testimony is undisputed that TLC never had any property titled in its name, *see* note 8 *supra,* and that TLC was intended to be only a management entity for the partnerships. II App. 100a; Brief of the Appellants at 22. Also undisputed is the fact that several of the partners (Bird, Jordan and Kootz) transferred their partnership interests to TLC in late August or early September of 1974 and later rescinded these transfers in November 1974 based on an alleged fraud or misrepresentation, *see* note 9 *supra;* and that the alleged "adoption" (see Appendix B hereto) of the partnerships' indebtedness by TLC occurred after the transfer of partnership interests to TLC, but prior to the attempted rescissions by the partners and the acceptance of the rescissions by Munroe. From these facts, a jury could have found that TLC was insolvent[28] or had ceased doing business once the rescissions were accepted by Munroe and that corporate property was distributed to several partners.[29] Thus we must hold that under the facts as presented there is a basis in Wyoming law for applying the trust fund remedy to the banks' claim against the individual partners who transferred their partnership interests to TLC.[30] Application of this remedy, however, is necessarily limited to the corporate property, if any, which was distributed to the individual partners. *See McWilliams v. Excelsior Coal Co., supra,* 298 F. at 886.

Of course before this equitable remedy is available to the banks, they must first establish that a corporate obligation existed. In claiming that the corporation adopted the indebtedness evidenced by the notes signed in Munroe's and Cant-Hook Cattle Co.'s names, the banks mainly rely on a document (III App. 101) signed by Munroe on behalf of TLC, and by Pearson on behalf of Lusk Bank.[31] *See* Appendix B to this opinion. Although this instrument does not clearly manifest an adoption by TLC of particular obligations, we feel that the instrument, together with the testimony and evidence of the surrounding circumstances, could be found to show an intent by TLC to adopt some or all of the 18 promissory notes. *See generally Durlacher v. Frazer,* 8 Wyo. 58, 55 P. 306, 308.

Consequently we must hold that the trial court erred when it refused to submit instructions to the jury on the banks' claim of corporate adoption. On remand, the new trial on this theory of the banks will be limited to those issues which relate to the alleged corporate adoption by TLC of the partnerships' indebtedness and to the claim for recovery therefor on the trust fund theory against the individual partners receiving distributions from TLC, except Mantello who admittedly received no such distribution. *See* note 30, *supra.*

### b. *The banks' other theories*

The banks have also asserted other arguments on their cross appeal which they say

---

27. *See generally Durlacher v. Frazer,* 8 Wyo. 58, 55 P. 306, 308; 15A W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7369–89 (Rev. ed. 1967).

28. Insolvency "denotes the insufficiency of the assets of a debtor to pay his debts in full." *Harle-Haas Drug Co. v. Rogers Drug Co., supra,* 113 P. at 798; *See generally* 15A W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7360, 7362–65 (Rev. ed. 1967).

29. We do not, at this time, express any view as to the validity of the various rescissions by the individual partners or the legal effect in Wyoming of a rescission if valid. *See generally* 15A W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7387, 7485 (Rev. ed. 1967).

30. Our holding necessarily precludes the application of the trust fund remedy against Mantello since that individual never transferred any partnership interest to TLC and presumably never received any distribution of TLC assets. Consequently as to Mantello the banks' cross appeal must fail.

31. We express no view on whether Munroe, as president of TLC, had the power to legally bind the corporation to debts which he incurred individually or which he authorized on behalf of Cant-Hook Cattle Co. *See generally Durlacher v. Frazer,* 8 Wyo. 58, 55 P. 306; 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 210 (Rev. ed. 1974); 2 *id.* § 761 at 1069 (Rev. ed. 1969).

would entitle them to a new trial on all issues. First, they claim that the trial court abused its discretion in refusing to grant their alternative motion for a new trial after granting them a judgment n. o. v. The rationale offered for this argument is that the standard for granting a new trial is easily met whenever the standard for granting a judgment n. o. v. is satisfied, and therefore it is an abuse of discretion not to grant the former motion whenever the latter motion is granted. Second, they argue that the trial court committed reversible error when it submitted to the jury a revised verdict form after the jury had retired for deliberation. Brief of the Appellees at 54–56.

■ It is true that the standard for granting a judgment n. o. v. is more onerous than that for granting a new trial. *See generally* 5A Moore's Federal Practice ¶¶ 50.05[2], 50.07[2]; 6A Moore's Federal Practice ¶¶ 59.04[5], 59.08[5]. However, Rule 50(c), F.R.Civ.P., clearly entitles a district court, who is ruling on alternative motions for a judgment n. o. v. and a new trial, to grant the former while denying the latter. *See generally* 5A Moore's Federal Practice ¶ 50.14 at 50–124; 9 C. Wright & A. Miller, Federal Practice and Procedure § 2540 at 616 (1971). Thus we cannot say, as the banks apparently suggest, that a denial of a new trial motion is automatically an abuse of discretion when a judgment n. o. v. is granted. Considering the evidence which we have reviewed in Parts I and II, *supra*, and our decision to reverse the trial court's entry of a judgment n. o. v., we cannot say that the trial court's denial of the banks' alternative motion for a new trial was an abuse of discretion. Likewise, we have reviewed the banks' other claim and find that it has no merit and requires no further discussion.

## IV

### *The Jordan Stock Certificate Issue*

At the close of all the evidence plaintiff-appellant Jordan asked for a directed verdict on the issue of whether his 5,000 share Greyhound stock certificate had been pledged as collateral for only one $40,000 Cant-Hook Cattle Co. note or for all the contested promissory notes. II App. 311. In its instructions the district court told the jury not to concern itself with the disposition of the Greyhound stock. II App. 320. Prior to submitting the case to the jury, the appellants' trial counsel made a timely objection to the court's withdrawal of the stock certificate issue, *id.* at 322–23, and the court reserved a ruling on all the motions for directed verdicts. XXII R. 1125. Later in granting the appellee banks a judgment n. o. v., the district court found *inter alia* that Jordan "was a partner in each of the partnerships and pledged 5,000 shares of Greyhound stock *to secure loans made by the defendant* . . . [Lusk Bank] *to the partnerships.*" I App. 59. (Emphasis added).

Appellant Jordan argues on appeal that the trial court erred in refusing to direct a verdict in his favor on the issue of whether the Greyhound stock certificate was pledged as security for only one of the contested promissory notes or, alternatively, if a directed verdict was not required, in failing to permit the jury to determine which of the eighteen promissory notes were collateralized by the stock certificate. Brief of the Appellants at 59; Reply Brief of the Appellants at 22. The appellee banks argue that if the judgment n. o. v. is not sustained, then "there is at least a jury issue as to whether the 5,000 shares of Greyhound stock was collateral for the entire line of credit . . . or whether it collateralized only one $40,000 loan." Brief of the Appellees at 52.

The evidence presented at trial indicates that in November 1973 Pearson requested additional security for the loans being made. II App. 118; Brief of the Appellants at 29; Brief of the Appellees at 12. In response to this request Jordan executed a Federal Reserve form U–1 pledging 5,000 shares of Greyhound stock as collateral for $40,000 of credit which was to be used for Cant-Hook Cattle Co. operating expenses. III App. 54; Brief of the Appellants at 29. After receipt of the Jordan stock certificate

and the Federal Reserve form, Pearson signed the latter and wrote to Jordan acknowledging the receipt of the certificate.[32] Enclosed in the letter to Jordan was Lusk Bank's collateral receipt for the stock which indicated that the securities were "collateral for Cant-Hook Cattle Co. loan." *Id.* at 53.

Subsequently Lusk Bank issued two short term loans of $30,000 and $5,000 to Cant-Hook Cattle Co. on the basis of two promissory notes which indicated on their face that they were secured by "stock assignment." *Id.* 209, 212. After the Cant-Hook Cattle Co. loans were consolidated in January 1974, only one promissory note for $40,000 indicated that it was secured by "stock" or an "assignment of stock." *Id.* at 2A. Of the remaining loan transactions involving promissory notes which were signed in the name of Cant-Hook Cattle Co. or Munroe, none indicated that they were secured by stock or an assignment of stock. II App. 53a; XX R. 735.

At trial Pearson testified that the stock constituted collateral for the entire line of credit advanced under the names of Cant-Hook Cattle Co. and Munroe. II App. 118. But on cross examination he said that it was his understanding that Jordan was pledging his stock behind a $40,000 Cant-Hook Cattle Co. note. Id. at 217–18. Pearson's testimony was further contradicted by the introduction of one of his letters to Munroe which said in part that (III App. 178A):

> Since the original loan was not adequately secured by livestock to allow . . . [Lusk] Bank to make a livestock loan on a 25% of bank capital basis, it was subdivided further into one note for $30,000 on equipment, one for $40,000 on a stock loan of 5000 shares of Greyhound stock provided by Foy D. Jordan . . . . .

However Pearson was not the only witness whose testimony on the issue was seemingly contradicted by his earlier actions. Jordan testified in substance that it was his intent to have the stock certificate serve as collateral for one $40,000 loan and that he interpreted Pearson's letter [33] as being consistent with that purpose or else he would have contested it. XVII R. 251–53. But shortly before receiving Pearson's letter, Jordan had written to Munroe and Bird asking that they assume equal responsibility for any bank loan encumbering his Greyhound stock "while said stock is pledged as collateral for *loans* by . . . [Lusk] Bank . . . to the Cant-Hook Cattle Company." III R. 204 (Emphasis added); XXI R. 972.

We cannot say that a judgment n. o. v. or a directed verdict was required since the evidence was not overwhelmingly supportive of either position. *Derr v. Safeway Stores, Inc.,* 404 F.2d 634, 636 (10th Cir.). Moreover, we believe that the trial court erred when it failed to submit this issue to the jury because there was evidence which arguably supported the positions taken by both sides. Consequently, the trial court's finding in its judgment n. o. v. must be set aside. On remand, the new trial should include the issue of which promissory note or notes of the eighteen were secured by the Jordan stock certificate.

## V

### *Conclusion*

In sum, we hold: (1) that the judgment n. o. v. for the appellee banks for $448,026.13 on the notes, attorney's fees and costs must be set aside since the evidence presented at trial did not overwhelmingly support any of their theories for such recovery which we discussed in Part II, *supra,* as against the

**32.** The letter from Pearson to Jordan said in part (III App. 265):

> I have received the Stock Certificate No. 1401 issued by the Greyhound Corporation for 5,000 shares of common stock, to be used as collateral for the $40,000 loan for Cant Hook Cattle Co.

> At the time the Cant Hook Cattle Co. loan has been paid in full, and there is no further requirement in negotiation and mutual agreement for future Cant Hook Cattle Co. financing, I will return the stock to you.

**33.** *See* note 32 *supra.*

jury's findings;[34] (2) that the trial court erred in not instructing the jury on the banks' theory of corporate adoption of the eighteen promissory notes; (3) that the banks are entitled to a new trial limited to issues surrounding the alleged corporate adoption of the eighteen promissory notes; (4) that the banks are entitled in the new trial to pursue their claim for recovery under the trust fund theory against the individual parties who received distributions from TLC; (5) that because appellant Mantello was not involved in any distribution of TLC assets, the trust fund theory is inapplicable as to him and therefore the district court should enter an appropriate judgment for him at the conclusion of the new trial; and (6) that neither the banks or appellant Jordan are entitled to a judgment as a matter of law on the Greyhound stock certificate issue as discussed in Part IV, *supra*, but that because the trial court erred in not submitting the issue to the jury, the parties are entitled to a new trial on the issue of which promissory note or notes of the eighteen were secured by the Jordan stock certificate.

Accordingly the judgment is reversed and the cause is remanded for further proceedings in accord with this opinion.

## APPENDIX A

### INTERROGATORY NO. 1

Was the open line of credit established at the Stockmans National Bank of Lusk (Lusk Bank) created for the use and benefit of the Cant-Hook Ranch, Cant-Hook Cattle Company, and Lusk Ranch? (Answer Yes or No) *NO*

### INTERROGATORY NO. 2

If your answer to Interrogatory No. 1 is "No", then for which partnership or partnerships, if any, was it established? (List partnership names)

 *CANT-HOOK CATTLE COMPANY*

\* \* \*

34. Therefore the verdict and special findings of the jury which are supported by the trial record and which went against the banks, must be upheld. Nevertheless, an entry of judgment on the verdict and findings must necessarily await the result reached in the new trial on the corporate adoption issue; if the banks should prevail on that theory, which was not submitted or decided by the jury, then judgment would be proper for the banks and against the plaintiffs-appellants to the extent of TLC assets distributed to the plaintiffs-appellants. *See McWilliams v. Excelsior Coal Co., supra*, 298 F. at 885.

We have noted earlier, see notes three and four, *supra*, that the Cant-Hook Cattle Co. partners and partnership admitted liability on this appeal for the eleven Cant-Hook Cattle Co. notes, for which a verdict of $176,210.59 was rendered against them and in favor of Lusk Bank. (See Appendix A hereto.) After the new trial, the trial judge may consider the propriety of entry of judgment on that admitted liability in light of the recovery, if any, granted on the corporate adoption theory.

APPENDIX A—Continued

V E R D I C T

We, the jury duly empaneled in the above-entitled case, do find generally for the plaintiffs and against the defendant Lusk Bank and find that the Bank owes the following plaintiffs the following amounts:

Cant-Hook Ranch $ 194,765.60

Lusk Ranch $ 166,898.71

with interest to be determined by the Court and further finds that plaintiff Cant-Hook Cattle Company partnership owes defendant Lusk Bank the principle sum of ___$ 176,210.59___ with interest and attorneys fees to be determined by the Court.

APPENDIX B

Extend note 60 days (to Nov. 5) - Bill to sign
, 5

Foy Jordan - new note signed by Bob with power of attorney for $45,000 collateral 10,000 shares Greyhound. (Changed date of extension to 60 days and initial 190 over prime on note)

Nov. 5 Collateral note with collateral agreement covering an assignment of $265,000 note and wrap around deed of trust to Cant Hook Cattle Co. @ 15% on Nov. 5. for 1 year for operating line of credit.
Continuing guaranty by Bob to TLC and Cant Hook Cattle Co., also other stockholders.

Bill → New FS on crops, feed, l/s + equip.

Personal statement of Bob Munroe.

Cant Hook + Bob Munroe loan total $ 514,000
from cattle 155,000
from silage 51,000

DEFENDANT'S EXHIBIT
101
C-76-151-K

## APPENDIX B—Continued

from wheat 6 Mbu ? (to be applied)
from downpayt. 65,000

_____

271,000
(draw... buy - Bill can sign) 243,000
secured by assignment of note & deed of trust 265,000
on Canthook land 2920 acres in Color with collateral note
and collateral agreement; new FS (Bill) on Torrington Land and
Cattle Co. on livestock, feed, crops and equipment;
guarantees by stockholders in the corporation.
All proceeds of collateral to be applied and operation fund
requirements advanced back based on budget provided by
TLC manager Bill Powell and agreed to by Stockmans National Bank of Husk
Power of attorney to Bill for ILC? for borrowing.
Certification by Secretary of State of Goodstanding.
May be some additional attorney and filing costs at time of recording TLC loan.
Agreed 9-24-74 Torrington Land and Cattle Mgt. Co. Robert d. Munroe
Witness [signature] L. Powell Stockmans National Bank H E Pearson

Required {